**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| APOTEX CORP., a Delaware corporation, | |
| Plaintiff, | CIVIL ACTION NO. |
| v. | **COMPLAINT** |
| HOSPIRA HEALTHCARE INDIA PRIVATE LIMITED, an Indian corporation, | JURY TRIAL REQUESTED |
| Defendant. | |

## TABLE OF CONTENTS

I.    NATURE OF THE CASE ................................................................................................. 1

II.   PARTIES ....................................................................................................................... 5

III.  JURISDICTION AND VENUE ..................................................................................... 5

IV.   FACTS COMMON TO ALL COUNTS......................................................................... 5

      A.    Generic Drugs Versus Brand Drugs .................................................................. 5
      B.    The Generic Drug Market.................................................................................. 7
      C.    Apotex ............................................................................................................... 8
      D.    The Agreement.................................................................................................. 9
      E.    Amendments to the Agreement ....................................................................... 12
      F.    Novation and Amendment No. 6 ..................................................................... 14
      G.    Hospira Systematically and Continuously Breaches Its Supply Obligations ....... 17
      H.    Hospira's Competition with Apotex ................................................................ 21

                  i.    Cefepime ............................................................................................ 22
                  ii.   Other Products .................................................................................. 26

      I.    Hospira Misleads Apotex While Sabotaging Apotex's Efforts to
            Commercialize the Products ........................................................................... 30
      J.    Harm to Apotex............................................................................................... 33
      K.    Apotex Attempts to Mitigate Its Damages...................................................... 35
      L.    Apotex Engages Hospira in Dispute Resolution Efforts.................................. 37

V.    FRAUDULENT CONCEALMENT AND TOLLING OF LIMITATIONS
      PERIODS .................................................................................................................... 38

VI.   COUNTS...................................................................................................................... 38

      COUNT I ..................................................................................................................... 38
      COUNT II .................................................................................................................... 39
      COUNT III ................................................................................................................... 40
      COUNT IV.................................................................................................................... 41
      COUNT V ..................................................................................................................... 43
      COUNT VI.................................................................................................................... 43
      COUNT VII .................................................................................................................. 45
      COUNT VIII.................................................................................................................. 47
      COUNT IX.................................................................................................................... 48

VII.  PRAYER FOR RELIEF ............................................................................................... 49

VIII. DEMAND FOR JURY TRIAL ..................................................................................... 50

i

Plaintiff Apotex Corp. ("Apotex") complains against Defendant Hospira Healthcare India Private Limited ("Hospira") as follows:

## I.      NATURE OF THE CASE

1.      Apotex brings this action to recover from Hospira the hundreds of millions of dollars it should have earned under a Development, Manufacturing, Supply and Commercialization Agreement (the "Agreement") by and between Apotex and Hospira's predecessor, Orchid Chemicals & Pharmaceuticals Ltd. ("Orchid").  Apotex and Orchid entered into the Agreement "with the objective of pooling the respective costs of development, manufacture and marketing of [certain drug products] and sharing the profits out of revenues from sale of such [products]."  Hospira thereafter assumed Orchid's obligations under the Agreement by entering into a Novation and Amendment No. 6 to Development, Manufacturing, Supply and Commercialization Agreement on or about March 23, 2010 (the "Novation"). Unlike Orchid, which did not sell finished drug products in the United States market, Hospira is (and was at the time of the Novation) engaged in the business of selling injectible generic pharmaceutical products in the United States and was therefore an existing Apotex competitor. Recognizing this, and as part of the consideration for its agreement to permit Hospira to assume, pursuant to the terms of the Novation, Orchid's rights under the Agreement, Apotex obtained certain additional conditions amending the terms of the Agreement.  In particular, Hospira expressly agreed that Apotex would be contractually entitled to recover as "liquidated damages" any profits lost as a result of, among other things, Hospira's failure to meet its supply obligations under the Agreement.  Remarkably, after assuming Orchid's obligations under the Agreement, Hospira crushed Apotex's ability to fully commercialize the relevant products by systematically and continuously failing to fulfill Apotex's orders.  At the same time, Hospira took advantage of

the supply constraints it improperly created for Apotex and competed against Apotex in the very product markets the parties had agreed to jointly commercialize.  The result: Apotex's sales plummeted while Hospira's sales of competing products sky-rocketed, thereby allowing Hospira to capture for itself hundreds of millions of dollars of profits that would otherwise have been shared by the parties under the Agreement, while at the same time damaging Apotex's relationship with customers.

2.      Apotex manufactures and distributes pharmaceutical products in a variety of global markets, including the United States.  In June of 2003, Apotex and Orchid entered into the Agreement to jointly develop and commercialize in the U.S. market generic versions of several different types of drug products, including: cefazolin, ceftriaxone, cefoxitin, cefepime, and piperacillin-tazobactam ("pip/taz").

3.      Under this co-development Agreement, Orchid was required, among other things, to: 1) develop the drugs subject to the Agreement; 2) obtain from the United States Food and Drug Administration (the "FDA") the necessary regulatory approvals; and 3) manufacture the drugs exclusively for Apotex in quantities sufficient to meet market demand.  Although Orchid was primarily responsible for executing these development activities, Apotex shared the cost associated with them.  Apotex in turn was responsible for commercializing generic versions of the drug products in the U.S. market and was required to purchase all its requirements for the products solely from Orchid.

4.      The partnership between Orchid and Apotex flourished for six years.  Apotex successfully commercialized in the U.S. cefazolin, ceftriaxone, cefoxitin, cefepime, and pip/taz. Orchid generally supplied Apotex with adequate quantities of these products to meet market

demand.  As required by the Agreement, Apotex reported its confidential sales information (including gross revenues, costs, and net profits) to Orchid, and the parties split the profits.

5.      In 2010, Hospira purchased Orchid's generic injectable business, including the manufacturing plant at which Orchid produced the products subject to the Agreement (hereafter, "IKKT").  After this acquisition, Hospira succeeded to the obligations of Orchid under the Agreement through the Novation.

6.      Splitting profits under the Agreement was apparently of little interest to Hospira. Instead, Hospira implemented a plan to cripple Apotex's ability to commercialize the relevant products and to capture for itself the sales that Apotex would otherwise have made.

7.      First, blaming manufacturing difficulties, Hospira sabotaged Apotex's efforts to commercialize cephalosporins and pip/taz in the U.S. by systematically and continuously failing to deliver the drug products Apotex ordered, creating a market shortage that U.S. customers blamed on Apotex.  Next, Hospira converted Apotex's confidential business information and filled the market demand it had created by selling competing products to Apotex's U.S. customers at prices at or below the prices offered by Apotex.  Hospira was aided by the fact that only it (and not Apotex) knew the true cost of goods for the products Hospira was obligated to supply to Apotex.  Hospira sourced its competing products in one of two ways, both of which violated Apotex's rights under the Agreement.  Some products were manufactured at the very facility that Hospira claimed was crippled by technical manufacturing issues, in breach of Hospira's obligation to prioritize the manufacture of cephalosporin products for Apotex over the requirements of any other entity (including Hospira itself).  Other products were sourced from third parties and sold by Hospira in competition with Apotex despite that Hospira was

3

contractually obligated to Apotex to mitigate its manufacturing problems by sourcing product from third parties to fill Apotex's otherwise unfilled orders.

8.      Hospira's scheme devastated Apotex's US market share in the relevant markets and diverted to Hospira hundreds of millions of dollars of profits that should have been shared between the parties under the terms of the Agreement.

9.      As set forth more fully below, Hospira materially breached the Agreement by:  (1) systematically and continuously failing to meet its drug supply obligations; (2) failing to prioritize manufacture of cephalosporin products for Apotex at manufacturing plants it operated; (3) failing to find replacement products for Apotex when Hospira could not fill Apotex's purchase orders; (4) wrongfully using Apotex's confidential business information in competition against Apotex in the relevant markets, (5) wrongfully entering into contracts, commitments or agreements that impaired or inhibited its ability to perform its obligations under the Agreement; and (6) wrongfully selling, offering for sale, manufacturing, supplying or otherwise providing cephalosporin drug products and/or their active pharmaceutical ingredient(s) ("API") to third parties in violation of the exclusivity and non-compete provisions of the parties' Agreement. Moreover, Hospira tortiously interfered with Apotex's existing and prospective business relationships, fraudulently concealed that it was competing with Apotex through the conversion of Apotex's confidential and proprietary business information, falsely assured Apotex of its intention and capacity to comply with the terms of the Agreement, and by the aforementioned conduct, violated the Florida Unfair and Deceptive Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201 et seq.

10.     As a result, Apotex seeks to recover compensatory and special damages, including but not limited to consequential damages, lost profits, restitution, and disgorgement of

profits; and all damages and relief available under New York common law and the Florida

Deceptive and Unfair Trade Practices Act, including but not limited to attorneys' fees and costs.

## II.    PARTIES

11.    Apotex is a Delaware corporation, which is doing business in the State of New

York and has its principal place of business at 2400 North Commerce Parkway, Suite 400,

Weston, Florida 33326.

12.    Upon publicly available information and belief, Hospira is an Indian corporation,

which is doing business in the State of New York and has its principal place of business at

SIPCOT Industrial Park, Irungattukottai, Sriperumburdur - 602 105, Tamil Nadu, India.  Upon

information and belief, Pfizer Inc. acquired Hospira in September 2015.

## III.    JURISDICTION AND VENUE

13.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) because

Apotex is a citizen of Florida, whereas Hospira is a citizen of a foreign state and the value of the

matter in controversy exceeds seventy-five thousand dollars ($75,000) exclusive of interest and

costs.

14.    Venue and personal jurisdiction are proper in the Southern District of New York

because the parties, by agreement, have submitted to such jurisdiction and venue and have

waived all claims of an inconvenient forum.

## IV.    FACTS COMMON TO ALL COUNTS

### A. Generic Drugs Versus Brand Drugs

15.    In the United States, pharmaceutical products generally are divided into two

categories:  brand products and generic products.  These products may either be self-

administered drugs, *e.g.*, oral drugs, suppositories, and topical medications self-administered by

5

the patient; or physician-administered drugs ("PADs"), *e.g.*, injectable and non-injectable drugs typically administered by healthcare professionals ("HCPs") in physicians' offices, clinics, hospitals, or laboratories.

16.     For new brand products to be approved for sale, drug manufacturers must submit a new drug application ("NDA") to the FDA.  The application must be supported by data demonstrating the drug's safety and efficacy for its intended use(s).

17.     An approved brand drug may receive patent protection on its chemical formulation or manufacturing process and is often marketed under a proprietary, trademark-protected name.  During the life of their patents, brand drugs are called "single-source" drugs because only the company that holds the patent lawfully can produce and sell them.

18.     After a brand drug's patent(s) has expired, generic copies of the exact chemical formulation usually become available to consumers at much lower cost.  Such drugs are referred to as generic or "multiple-source" drugs.

19.     Generic drugs, by design, obtain regulatory approval under a shorter process than brand drugs.  Generic manufacturers can submit an abbreviated new drug application ("ANDA") to the FDA, which relies on the safety and efficacy evidence previously submitted by the manufacturer of the corresponding brand product.  To gain FDA approval, a generic drug must have the same API, strength, dosage form, route of administration, and intended use(s) as its brand counterpart, and it must meet the same quality and manufacturing standards.  The process by which generic drugs obtain FDA approval is described in the Federal Trade Commission's ("FTC") study titled *Generic Drug Entry Prior to Patent Expiration: An FTC Study* (FTC July 2002) [the "*Generic Drug Entry Study*"].[1]

---

[1] *Available at* https://www.ftc.gov/sites/default/files/documents/reports/generic-drug-entry-prior-patent-expiration-ftc-study/genericdrugstudy_0.pdf (last accessed on May 21, 2018).

**B.  The Generic Drug Market**

20.     Competition in the U.S. drug market varies significantly depending on whether a manufacturer is marketing a brand or generic drug.  Manufacturers selling brand drugs often enjoy temporary market monopoly power, which enables them to command large profits by charging consumers and HCPs prices above those charged in non-monopolistic (or "mature") markets.

21.     Manufacturers typically market their brand products by promoting the benefits directly to physicians, *i.e.*, "detailing," and, in some cases, through direct-to-consumer advertising.  In this way, manufacturers educate prescribers and patients about the therapeutic qualities of their brand products, including the indications for which they are approved.

22.     Manufacturers often sell brand drugs to drug wholesalers or distributors.  Retail pharmacies usually acquire brand drug products through the wholesalers and distributors that purchase from the manufacturer and not directly from the manufacturer itself.

23.     The expiration of a brand drug's patent frequently prompts more than one generic copy to enter the market.  The central purpose of the Drug Price Competition and Patent Term Restoration Act of 1984 (commonly referred to as the "Hatch-Waxman Act") is to promote generic competition and get generics into the hands of patients on the earliest date possible under the law.[2]  The Hatch-Waxman Act reconfigured the existing generic drug approval process to speed up generic drug introduction to the market.  The legislation encouraged generic entry by creating a 180-day marketing exclusivity period for the first generic firm to do so.

24.     As the FTC notes in its *Generic Drug Entry Study*, generic drugs are generally far less expensive than brand products and the market entry of generic drugs can result in large

---

[2] *See generally*, *Generic Drug Entry Study* at 3-8 (discussing Hatch-Waxman Act).

savings to consumers.[3]  Indeed, the FTC found that the price of generic pharmaceuticals is

approximately half that of brand drugs.[4]  One of the reasons for this market phenomenon is that,

unlike brand companies, generic manufacturers do not detail physicians or market directly to

consumers.  Instead, generic drugs that are "AB" rated as therapeutically equivalent to a

particular brand drug, with certain limited exceptions, are automatically substituted and

dispensed to patients who are prescribed the reference brand drug.  Indeed, all states and the

District of Columbia have what are referred to as generic substitution laws which promote the

use of generic products by requiring or authorizing a pharmacist to fill a patient's prescription

with a generic product.  Because of these laws,[5] once generic products enter the market, the

brand products lose significant market share at a precipitous rate to the generics, a phenomenon

that is referred to as the generic cliff or waterfall.[6]  The loss in the brand product's market share

is captured by the generic market participants.

     25.     Because multiple manufacturers sell nearly identical generic versions of the same

product, they distinguish themselves and compete against one another for market share based on

price, consistency of supply and quality.

**C. Apotex**

     26.     Apotex is an innovative global research and technology leader in generic

pharmaceuticals.

---

[3] Generic Drug Entry Study at 9.

[4] *Id.*

[5] *Improving Health Care: A Dose of Competition* at 12-13(FTC, DOJ July 2004) ("Because generic drugs
are substantially less expensive than their brand-name counterparts, generic substitution lowers
prescription drug costs."), *available at*
https://www.ftc.gov/sites/default/files/documents/reports/improving-health-care-dose-competition-report-federal-trade-commission-and-department-justice/040723healthcarerpt.pdf (last accessed on May 21,
2018).

[6] As the FTC notes, "generic entrants gain significant market share at the expense of their rival brand
name drug companies after their entry."  *Generic Drug Entry Study* at 9.

27.     Apotex sells a variety of SADs and PADs, including specialty and injectable products.  Among these are generic antibiotic and antibacterial injectable products, including cephalosporins.  These products belong to therapeutic classes in which generic competition is robust.

28.     Apotex competes with many manufacturers producing virtually identical drugs. Apotex differentiates itself in several ways, including price, quality, breadth of portfolio, and consistency of supply.

29.     Consistency of supply is an especially important factor in the generic pharmaceutical market, as Apotex is required to compensate many of its customers for any considerable delay or failure to supply products under the terms of its customer agreements.

30.     To timely meet customer demand, Apotex periodically contracts with third parties engaged in the development and manufacture of API and finished dosage forms of drugs in Apotex's product pipeline.

**D.  The Agreement**

31.      On or about June 2, 2003, Apotex and Orchid entered into the Agreement.  Both parties' overarching objective was to "pool[] the respective costs of development, manufacture and marketing of Products [injectable cephalosporins identified in Exhibit C(1) and C(2) of the Agreement (hereinafter, the "Products")]," and "shar[e] the profits out of revenues from sale of such Products in the Territory."  *Id.* at 1.

32.     The Agreement was multi-faceted.  Orchid agreed, *inter alia,* to: (1) "conduct development and testing work on the API and the Products;" (2) to obtain FDA approval for the products; (iii) "to be a source of intermediate and starter components . . . for the manufacture of [API] . . . and to be a source for such other finishing ingredients, if any, and final containers

necessary to manufacture the API into Products . . . ;" (iv) to be a manufacturer and source of the Products;" and (v) "to be a supplier to Apotex of Products."  Agreement at 1.  Apotex, meanwhile, agreed to provide consulting services to Orchid and to commercialize the Products in the United States.  *See id.* § 1.36. at 1.

33.     Orchid's product development obligations are described in Article 3 of the Agreement.  In consultation with Apotex, Orchid was required to perform all activities related to the development of the Products, including conducting tests, studies and clinical trials necessary to the preparation and filing of an ANDA or to meet other regulatory requirements.  Agreement § 3.1(b).  Under the Agreement, Orchid was responsible for filing, in its own name, any ANDA or other regulatory filings and to consult and jointly agree with Apotex regarding the timing of any such filings.  *Id.* § 3.3(a).  The Agreement also provides for Orchid and Apotex to negotiate the joint development or marketing of any additional therapeutic indications identified for the Products during the term of the Agreement.  *Id.* § 3.6(a).

34.     Article 6 of the Agreement governed the marketing and commercialization of Products and profit sharing from commercial sales in the Territory.  Section 6.1 incorporated by reference Exhibit E to the Agreement, which consists of Apotex Projected Marketing & Commercialization Plans (the "Plans") for each Product.  The Plans included: 1) an anticipated launch date; 2) sales projections, 3) the Apotex net price per unit, and 4) other information, including commercially sensitive pricing information.  Under Article 6.2 of the Agreement, Apotex is required to provide Hospira with quarterly statements used to support Apotex's calculation of the profit sharing payment owed to it.  Each of these quarterly statements must include the following confidential information: "the total units of Products sold, associated net sales price (per Product), and Operating Profit."  *Id.* § 6.2 (b).

35.     The parties identified the Products subject to the Agreement on Exhibits C(1) and

C(2) of the Agreement; these included:  cefazolin, ceftriaxone, cefotaxime, ceftazidime,

cefoxitin, cefotetan, cefepime, and piperacillin/tazobactam (a/k/a "pip/taz").[7]  The Agreement's

term "commence[d] upon the Effective Date," *i.e.*, June 2, 2003, and "continue[d] . . . with

respect to each Product Family for ten years after the Actual Launch Date," as defined in §

5.1(b).  *See id.* § 12.1(a).

36.     Orchid contracted to supply Apotex exclusively with the API and finished dosage

form for each drug in each Product Family.  Specifically, Orchid agreed "to sell, offer for sale,

lease, manufacture, supply and/or test the Products listed in Exhibit C (1) and C(2) of this

Agreement *solely and exclusively to Apotex for sales and marketing in the Territory* in

accordance with the terms and conditions of this Agreement."  Agreement § 7.1(a) (emphasis

added).  With regard to API for the Exhibit C(1) drugs, the Agreement provided:

> During the Term Orchid shall not sell the API used in such Products of Exhibit
> C(1) for use in any Drug Product that is the same as any Product in Exhibit C(1)
> to any third party in the Territory or to any third party that Orchid knows or
> reasonably believes is selling such API into the Territory[8] for use in any Drug
> Product that is the same as any Product in Exhibit C(1).

*See id.* § 7.1(b)(i) (emphasis added).  Apotex insisted on this obligation because Apotex shared

in the development costs of the Products and therefore wanted to make sure that Orchid would

not later compete with it, either directly (selling it itself) or indirectly (supplying competitors).

37.     Under § 7.1(b)(ii), Orchid could supply API for Exhibit C(2) drugs to others but

only "to those specific third parties with whom Orchid has arrangements to supply prior to the

---

[7] Exhibit C(1) and C(2) to the Agreement and Amendment No. 1 (as defined below) describe this product
only as tazobactam.  The drug is described as "piperacillim-tazobactum" for the first time in the Novation
(as defined below).

[8] "Territory" is defined to include "the United States and its respective territories, possessions and
military institutions."  Agreement § 1.36.

[Agreement's] Effective Date."  (emphasis in original).  Orchid warranted that "no contracts, commitments or agreements of any nature exist, and Orchid covenants that none will be entered into during the Term, that impair or inhibit the ability of Orchid to perform its obligations hereunder."  Agreement § 14.2(a).

38.     In addition to agreeing it would exclusively supply Product to Apotex,

> [d]uring the Term, Orchid agree[d] that it *will not, nor will it permit or cause its Affiliates or any third party to, enter into any agreement or arrangement to exploit, including without limitation to manufacture, sell, offer for sale or commercialize, in the Territory any of the Products supplied to Apotex hereunder*; provided that this shall not apply to API used in Products listed in Exhibit C(2) of this Agreement as per Section 7.1(b)(ii).

Agreement § 7.3(a) (emphasis added).

39.     Article 7's limitations applied to any "Product," defined as "a finished dosage form of a Drug Product that (i) is listed in Exhibit C1 or C2 of th[e] Agreement; (ii) is the same as a Listed Drug as defined under 21 C.F.R. § 314.3 included in 'Approved Drug Products with Therapeutic Equivalence Evaluations,' (the 'Orange Book') current as of the Effective Date and (iii) is a Generic Product."  Agreement § 1.27.

**E.  <u>Amendments to the Agreement</u>**

40.     Between June 2003 and January 2010, Orchid and Apotex amended the agreement on five separate occasions.

41.     On March 6, 2006, Apotex and Orchid executed an Amended and Restated Development, Manufacturing, Supply and Commercialization Agreement (hereinafter, "Amendment No. 1").  The purpose of Amendment No. 1 was to "amend and restate some of the provisions of the [June 2003] Agreement," primarily those reflecting and relating to the parties' profit sharing and payment of transfer prices.  *See generally*, Amendment No. 1 at 1, §§ 5.7, 6.2, 6.3.  With the exception of one non-material revision to § 5.12(b), Amendment No. 1 did not

change the following provisions of the Agreement, leaving unaffected the rights and obligations arising thereunder: § 1.27 ("Product"); § 1.36 ("Territory"); § 5.12(a) (Notice of Delay); § 5.12(b) (Remedy; Offset); § 5.13 (Minimum Sales Obligations Not Applicable); § 7.1 (Exclusivity); § 7.3 (Non-compete);  § 12.2(b) (Arbitration); § 12.2(c)(i)-(iv) ("Gross Breach"); Article 14 (Orchid General Warranties); Article 15 (Covenants by Orchid); § 19.8 (Governing Law); § 19.9(a) (i) ("A Party is not required to submit Gross Breaches to arbitration."); and § 19.9(b) (Jurisdiction).

42.     Amendment No. 2 was executed on or about November 8, 2006.  In Amendment No. 2, the parties acknowledged that Orchid had been selling cefazolin injectable products to "various third parties for use in the Territory."  Amendment No. 2 at unnumbered page 1. Orchid and Apotex amended the Agreement to authorize sales of cefazolin injectable products only to a list of "Permitted Customers."  Orchid agreed to pay royalties to Apotex in the amount of 5 percent of the "Total Supply Price" (as defined in Amendment No. 2) to the Permitted Customers.  Amendment No. 2 at § 6.  In addition, Orchid agreed to sell cefazolin injectable products to Permitted Customers for an amount at least 30 percent higher than the transfer price it charged Apotex for such products.  *Id.* at § 4.  Finally, Orchid agreed that it would give priority to Apotex over any of the Permitted Customers.  *Id.* at § 5.  This concept of priority meant that if Orchid had unfilled orders for cefazolin products from both Apotex and any Permitted Customers and was unable to manufacture and supply sufficient quantities of such products to fill all outstanding orders, Orchid was required to allocate all supply of any such products first to Apotex until all outstanding Apotex orders had been filled before allocating any supply to any of the Permitted Customers.

43.     The parties executed Amendment No. 3 on or about February 27, 2007. Amendment No. 3 largely focused on the launch of generic cefepime.  The parties agreed to jointly defend any patent lawsuit related to the launch of the product.  In addition, Apotex agreed to pay Orchid $1.9 million in connection with the development costs associated with the development of generic cefepime.  All other material terms remained unchanged.

44.     On or about May 4, 2007, the parties entered into Amendment No. 4.  The amendment made no changes to the Agreement that are material to this dispute.

45.     On or about December 4, 2009, Orchid and Apotex entered into Amendment No. 5 to the Agreement.   Amendment No. 5 dealt primarily with the pip/taz product.  Pursuant to Amendment No. 5, Apotex agreed to pay Orchid $255,000 (fully 50 percent) of unforeseen costs incurred by Orchid in connection with the development and regulatory approval of the product. In addition, the parties agreed to split legal fees incurred in connection with pursuit of the product.  All other material terms remained unchanged.

**F. <u>Novation and Amendment No. 6</u>**

46.     Upon publicly available information and belief, Hospira acquired Orchid's generic injectable finished dosage form pharmaceuticals business, including the manufacturing plant at IKKT, in 2010.

47.     On or about March 23, 2010, Apotex, Orchid, and Hospira, executed the Novation.  The Novation substituted Hospira for Orchid "in all the obligations of Orchid under the Agreement as though Hospira were the signatory thereto and agree[d] to perform all obligations of Orchid under the Agreement[.]"  Novation § 1(A)(i).  It stated that, "[e]xcept as amended by this Amendment, the terms and conditions of the Agreement shall remain in full force and effect."  Novation § 1(M)10.

48.     The Novation establishes that, like Orchid, Hospira will "solely and exclusively manufacture the Products listed in Exhibit C(1) and C(2) of this Agreement . . . for Apotex for marketing and sale in the Territory."  Novation § 1(I).  And, like Orchid,

> Hospira [] agree[d] that *it will not, nor will it permit or cause its Affiliates or any third party, other than Apotex, to enter into any agreement or arrangement to sell or offer for sale in the Territory any Products listed in Exhibit C(1) or C(2)* which were manufactured by Hospira [] and/or its Affiliates at IKKT [*i.e.*, Hospira's facility in Irungattukottai, India] or any other facility or location owned or leased by Hospira [] and/or its Affiliates.

Novation § 1(J) (emphasis added).  The priority provisions applicable solely to cefazolin and originally included in Amendment No. 2 were expanded to apply to all Products under the Agreement.  Thus, if Hospira became unable to supply any Product in accordance with its obligations, Hospira was required to provide replacement product from a third-party source.  Novation § 1(H).

49.     In the Novation, the parties agreed that Apotex shall be entitled to lost profits in the form of liquidated damages caused by Hospira's inability to supply Product as required by the Agreement.  Apotex is also entitled to recover from Hospira any monetary penalties that Apotex is assessed by its customers as a result of Hospira's inability to supply Products.  Section 1(H) of the Novation states in pertinent part:

> In the event that Hospira [] is unable to supply Product in accordance with this Agreement then Apotex shall, in its sole discretion, be entitled to (i) *require Hospira [] to provide replacement product from a third party source (any incremental amount above the Transfer Price to be at Hospira India's sole cost);* and (ii) *collect liquidated damages from Hospira [] equal to the average historical profit split levels (calculated from the previous three (3) months) for the undelivered quantities of Products for so long as such inability to supply exists*, provided that Apotex is in compliance with all of its obligations under this Agreement.  *[I]f Apotex is assessed penalties under a contract with a third party as a result of Hospira[]'s inability to deliver Product, then Apotex may either, in its discretion but upon notice to Hospira [], deduct the amount of the penalty from Hospira[]'s share of the Net Product Sale Price or bill Hospira [] (and Hospira [] shall promptly pay) the amount of such penalty . . . .*

(emphasis added).

50.     Hospira further agreed,

during the Term, so long as Orchid is the sole API supplier to Hospira [] and its
Affiliates for the Products in Exhibit C(1) and C(2), Orchid shall not sell the API
used in such Products for use in any Drug Product that is the same as any Product
in Exhibit C(1) or C(2) to any third party in the Territory or to any third party that
Orchid knows or reasonably believes is selling such API into the Territory for use
in any Drug Product that is the same as any Product in Exhibit C(1) or C(2)[.]

Novation § 5.

51.     Thus, subject to certain limited exceptions,[9] Hospira could not compete with

Apotex with respect to the following product families:

- ceftriaxone;

- cefotaxime;

- ceftazidime;

- cefoxitin;

- cefotetan;

- cefepime; and

- pip/taz.

52.     The Novation did not amend § 14.2(a) of the Agreement, pursuant to which

Hospira (like Orchid) agreed and warranted, without qualification, that "no contracts,

commitments or agreements of any nature exist" and "that none will be entered into during the

Term, that impair or inhibit the ability of [Hospira] to perform its obligations hereunder."

Agreement § 14.2(a).

_____

[9] The Novation maintained Hospira's right to supply Existing Competing Products (consisting of three
specific cefazolin products) to a List of Permitted Customers which included Sandoz, Watson, Cura,
Ranbaxy and Hospira.  Novation § 1(I).

G. **Hospira Systematically and Continuously Breaches Its Supply Obligations**

53.     As required by the Agreement, Apotex regularly provided Hospira (and Orchid before it) with rolling forecasts and purchase order forms identifying each Product by name, vial size, Product Family, market, and other information.

54.     Between 2003 (when Orchid and Apotex entered the Agreement) and 2010 (when Hospira succeeded to Orchid's obligations under the Agreement), Orchid largely met its contractual obligations to supply Apotex's requirements for the Products.

55.     After Hospira succeeded to Orchid's obligations under the Agreement, however, Apotex began to experience episodic supply problems relating to one or more of the Products.

56.     The supply problems intensified in 2012.  From that time forward, Hospira repeatedly and continuously failed to satisfy its obligations under the Agreement to timely supply conforming Products to Apotex.

57.     As set forth in detail below, Hospira's supply failures were systemic and pervasive.

58.     Hospira consistently failed to deliver Products to Apotex on time, and many of its deliveries did not contain the amount of Product ordered.  For purchase orders with requested delivery dates in 2012, for example, Hospira delivered Product on time for only 1 of the 58 purchase orders that Apotex submitted.  Two of the purchase orders were fulfilled almost 15 months late, that is, more than one year after the specified delivery date.[10]  Hospira supplied less

_____

[10] *See, e.g.*, Purchase Order Nos. 4500398464 (Product delivered 447 days late), 4500398464 (Product delivered 402 days late).  The collection of Purchase Orders are attached hereto as Exhibit 1.

than the required amount of Product for 7 of Apotex's purchase orders.[11]  A small sample of

these failures is illustrated in the table below:

| Purchase Order No. / Product | Quantity Required | Quantity Received | Delivery Date Required | Delivery Date Received |
|---|---|---|---|---|
| 4500389606 / cefepime inj 1g 10x20ml | 6,650 | 5,976 | 9/30/2012 | 11/2/2012 |
| 4500395417 / cefoxitin inj 10g 10x100ml | 525 | 435 | 12/3/2012 | 4/18/2013 |
| 4500389615 / ceftriaxone inj 250mg 10x10ml | 4,750 | 4,050 | 10/30/2012 | 12/12/2012 |

59.     The same pattern continued in 2013.  Apotex submitted 384 purchase orders for

Products to be delivered by Hospira in 2013.  Hospira failed to timely deliver Product in

response to 357 of these purchase orders.[12]  In response to 111 of these purchase orders, Hospira

failed to deliver the amount required.[13]

The table below provides but a few examples of Hospira's failures to supply in 2013:

| Purchase Order No. / Product | Quantity Required | Quantity Received | Delivery Date Required | Delivery Date Received |
|---|---|---|---|---|
| 4500423383 / cefazolin inj 1g 25x20ml | 33,250 | 29,400 | 12/9/2013 | 7/24/2014 |
| 4500432371 / cefepime inj 2g 10x20ml | 3,325 | 2,304 | 6/17/2013 | 7/10/2014 |
| 4500426412 / cefoxitin inj 1g | 2,400 | 1,392 | 11/27/2013 | 1/29/2014 |

---

[11] *See, e.g.*, Purchase Order Nos. 4500389606 (shortfall of 674 units), 4500389615 (shortfall of 700 units), 4500389620 (shortfall of 589 units), Ex. 1.

[12] *See, e.g.*, Purchase Order Nos. 4500404815 (Product delivered 480 days late), 4500405116 (Product delivered 407 days late), 4500410217 (Product delivered 465 days late), Ex. 1.

[13] *See, e.g.*, Purchase Order Nos. 4500395420 (shortfall of 3,030 units), 4500400804 (shortfall of 2,200 units); 4500410231 (shortfall of 2,180 units), Ex. 1.

| 25x20ml | | | | |
| 4500395420 / ceftriaxone inj 500mg 10x10ml | 3,900 | 870 | 1/4/2013 | 3/14/2013 |

60.     In May 2013, for example, Apotex electronically transmitted from its headquarters in Weston, Florida to Hospira's R&D facility in Chennai, India (1) an 18-month rolling forecast for different quantities, dosage forms, and strengths of cefazolin, cefepime, cefoxitin, ceftriaxone, and pip/taz products; and (2) purchase orders stating the item number and number of units to be shipped to Apotex in Plainfield, Indiana and billed to Apotex in Weston, Florida.  Apotex intended and attempted to market and commercialize these Products in the Territory, *i.e.*, the United States.  Apotex engaged in these efforts in accordance with its commercialization responsibilities under the Agreement and the Plan.  Certain lots of Hospira's pip/taz Bulk Pack Products were never delivered.

61.     Hospira's failure to fulfill Apotex's supply requirements interfered with Apotex's efforts to commercialize the Products and prevented Apotex from fulfilling its own obligations to supply its U.S. customers with the Products.  As a consequence, Apotex was forced to pay its customers millions of dollars in failure to supply penalties.

62.     On August 1, 2013, Hospira's Vice President, Karen Blair, wrote to Apotex's Associate Director, Global Business Development, Michael Ascenzo, to acknowledge the "penalties that may have been assessed against [Apotex] by GPO's, on tender contracts, etc. due to [Apotex's] inability to supply Products to them caused by [Hospira's] supply failure.

63.     The year 2014 was no different.[14]  Out of the 292 purchase orders Apotex submitted for deliveries to be made in 2014, 192 resulted in late deliveries.  Hospira delivered

---

[14] As an example, Hospira made late delivery *and* delivered insufficient quantity of Product in response to Apotex's Purchase Order Nos. 4500430842, 4500466988, 4500470471,  Ex. 1.

less than the required amounts in response to 77 purchase orders, highlighted by a shortfall of as

large as 8,532 units for one purchase order.  Some of these failures are illustrated below:

| Purchase Order No. / Product | Quantity Required | Quantity Received | Delivery Date Required | Delivery Date Received |
|---|---|---|---|---|
| 4500460003 / cefazolin inj 1g 25x10ml | 14,220 | 5,688 | 9/10/2014 | 10/22/2014 |
| 4500458095 / cefoxitin 1g 25x20ml | 2,700 | 1,975 | 8/20/2014 | 9/10/2014 |
| 4500440960 / ceftriaxone 250mg 10x10ml | 14,250 | 12,650 | 5/30/2014 | 7/29/2014 |
| 4500463670 / pip/taz 40.5g 300ml | 2,700 | 2,294 | 10/30/2014 | 2/3/2015 |

64.     Hospira did not remedy this systemic pattern of non-compliance and similar

untimely and inadequate deliveries persisted in 2015 and 2016.[15]  Examples of Hospira's failures

during 2015 and 2016 are listed below:

| Purchase Order No. / Product | Quantity Required | Quantity Received | Delivery Date Required | Delivery Date Received |
|---|---|---|---|---|
| 4500473822 / cefazolin inj 1g 25x10ml | 12,000 | 11,623 | 1/12/2015 | 2/24/2015 |
| 4500505540 / cefazolin inj 10g 10x100ml | 5,886 | 5,722 | 1/30/2016 | 1/11/2016 (no delay) |
| 4500476410 / cefepime inj 1g 10x20ml | 6,650 | 3,456 | 2/27/2015 | 6/8/2015 |
| 4500517145 / cefepime inj 1g | 39,900 | 19,980 | 3/30/2016 | 2/16/2016 (no delay) |

---

[15] With respect to purchase orders for deliveries in 2015, Hospira made late delivery *and* delivered insufficient quantity of Product in response to, among others, Purchase Order Nos. 4500482913, 4500486343, 4500499666, Ex. 1.  Purchase Orders for deliveries in 2016 suffered the same fate, such as Purchase Order Nos. 4500517145 (shortfall of 19,920 units), 4500514860 (Product delivered 26 days late), Ex. 1.

| 20ml | | | | |
|---|---|---|---|---|
| 4500476394 / ceftriaxone inj 500mg 10x10ml | 3,900 | 2,630 | 2/27/2015 | 4/16/2015 |
| 4500514860 / ceftriaxone | 5,592 | 5,592 (no shortage) | 2/19/2016 | 3/16/2016 |
| 4500480977 / pip/taz inj 40.5mg 300ml | 2,700 | 2,461 | 3/20/2015 | 7/28/2015 |

65.     The supply deficiencies described herein were compounded by Hospira's failure to seek replacement product from third parties and supply the same to Apotex when Hospira knew or should have known that it could not fulfill Apotex's purchase orders, and/or could not do so timely or fully.

66.     Hospira's systemic and continuous failure to meet its supply obligations constitutes a Gross Breach of the Agreement.

67.     Hospira's breaches were neither justified nor excused by any provision of the Agreement.

### H.  Hospira's Competition with Apotex

68.     Hospira has sold or otherwise supplied to third parties in the Territory certain drugs that directly compete with Apotex's sale of the Products.  Hospira's competitive products include Maxipime™, a drug manufactured by Hospira at IKKT and sold by it in the Territory in competition with the cefepime products Hospira is obligated to manufacture for Apotex at the same IKKT facility.  Other drugs are third-party manufactured generic versions of the same drugs that Hospira manufactures for Apotex at IKKT: cefoxitin, ceftriaxone, cefazolin, and pip/taz.

69.     At all times material to this dispute, as more fully set forth below, Hospira sold Maxipime™, and sold or caused to be sold competitive versions of cefoxitin, ceftriaxone,

cefazolin and pip/taz, in the Territory while it was systemically and continuously failing to supply Apotex's requirements for these very same products.

70.     As further detailed below, Hospira's deliberate decision to divert supply of Products to its own use in competition with Apotex at the very time that it had failed to fulfill its supply obligations under the Agreement was a knowing, intentional and willful breach of the Agreement.

### i.   Cefepime

71.     The cefepime family is among the Product Families listed in Exhibit C(1) to the Novation, which Hospira agreed to manufacture exclusively for Apotex for marketing and sale to customers in the United States.  In addition to agreeing to manufacture cefepime exclusively for Apotex, Hospira agreed that if it was unable to manufacture sufficient quantities of cefepime for Apotex at IKKT, it would provide replacement product from a third-party source at its sole cost and expense.

72.     Hospira is contractually obligated, pursuant to the terms of the Agreement, as amended, to supply Apotex with its cefepime requirements.  Despite these agreements, however, since 2012, Hospira has systemically and continuously failed to supply Apotex with Apotex's requirements for cefepime.  Examples of cefepime purchase orders that Hospira failed timely to fulfill is included in the spreadsheet attached hereto as Exhibit 1.

73.     Hospira's failure to supply Apotex's cefepime requirements was part of a deliberate strategy to sabotage Apotex's ability to commercialize cefepime in the U.S. while at the same time expand sales of its competing Maxipime™ product.

74.      On information and belief, Hospira acquired the rights to Maxipime™ (the brand version of cefepime, including the rights to sell Maxipime™ in the United States) under an

approved New Drug Application, in or around 2012.  Maxipime™ is listed in the FDA's

National Drug Code ("NDC") Directory under the product NDCs 0409-0217, 0409-0218, 0409-

0219, and 0409-0220.[16]  Maxipime™ is the "reference listed drug" for all generic cefepime

products marketed in the United States, including the cefepime product that Hospira

manufactures for Apotex at its IKKT facility.  Apotex's cefepime product contains the same API

as Maxipime™.  Orchid and Apotex obtained FDA approval to market cefepime in the United

States under an Abbreviated New Drug Application after satisfying the FDA, *inter alia,* that their

cefepime product had been shown to work in the human body in the same way as does

Maxipime™.  Orchid and Apotex's cefepime product was approved as an AB rated generic of

Maxipime™.  An AB rating signifies that the generic product is fully and automatically

substitutable for the brand product.  Thus, when a prescriber writes a prescription for

Maxipime™, the pharmacy (except in very limited circumstances) will fill that prescription using

a generic version of the drug.

75.     Publicly available data suggests that Hospira began competing with Apotex by

selling Maxipime™ in the United States beginning sometime in 2013.

76.     As of January 2013, four generic drug companies had entered the market for

cefepime.  Apotex was the market leader with 46.17 percent of that market; Sagent

Pharmaceutical was second with 30.68 percent; Fresenius Kabi USA was third with 16.07

percent, and Sandoz was fourth with 7.08 percent.  Because the brand product is almost always

substituted for by the generic product, as would be expected in a mature drug market, sales of the

brand reference drug (Maxipime™) were negligible.

---

[16] *See* NDC Directory MAXIPIME,
https://www.accessdata.fda.gov/scripts/cder/ndc/dsp_searchresult.cfm  (last accessed May 21, 2018).

77.     The market for cefepime products began to change in March of 2013.  Data indicates that Hospira's Maxipime™ product unexpectedly captured 6.79 percent of the market in that month.  Between March of 2013 and December of 2016, the Maxipime™ share of the cefepime market fluctuated, often in lock-step with declines in Apotex's own market share.  Thus, in August of 2013, the Maxipime™ share of the market increased to 16.46% while Apotex's share declined to 13.48%.  By April of 2014, the Maxipime™ share had reached 18.26 percent of the market, and it passed 20 percent of the market for the first time in May of 2014.  Remarkably, in August of 2016, Maxipime™ captured 56.68 percent of the cefepime market— more than all generic competitors combined.  For that same month, Apotex's share declined to 0.19 percent of the market.

78.     As alleged in more detail below, the declines in Apotex's cefepime market share, and the increases in the market share obtained by Hospira's Maxipime™, coincided with Hospira's systematic failure to fulfill Apotex's requirements for cefepime.

79.     During the relevant period, to fill orders for its Maxipime™ product, Hospira manufactured Maxipime™ at its IKKT facility, while failing and willfully refusing to manufacture cefepime, as required by the terms of the Agreement and pursuant to outstanding purchase orders for cefepime issued by Apotex to Hospira in accordance with the terms of the Agreement.

80.     Hospira created market demand for its Maxipime™ product by failing and refusing to manufacture cefepime for Apotex at IKKT.  Hospira knew that the effect of its conduct was to create unmet demand at the expense of Apotex because Apotex continuously informed Hospira that its failure to fulfill Apotex's supply requirements was causing Apotex to incur failure to supply penalties.

81.     Hospira ensured that it was able to meet the market demand for cefepime created by its conduct by manufacturing Maxipime™ at its IKKT facility, while at the same time failing to manufacture cefepime pursuant to its obligations under the Agreement.  Hospira's decision to manufacture Maxipime™ rather than cefepime at IKKT was a knowing, intentional and willful breach of its obligation to prioritize manufacture of cefepime over the manufacture of Maxipime™.  Hospira's decision to divert the supply of cefepime product it manufactured at IKKT to its own use for sale as branded Maxipime™ was a knowing, intentional and willful breach of its supply obligations under the Agreement.

82.     Hospira used Apotex's confidential business information together with a novel marketing strategy to target Apotex's existing and potential cefepime customers and to obtain Maxipime™ sales from them at the expense of Apotex.  Thus, Hospira solicited Apotex's contract customers, offering to sell them Maxipime™ in place of the cefepime that Apotex was unable to supply because of Hospira's failure to supply cefepime to Apotex as required by the Agreement.  Moreover, although  Hospira's Maxipime™ is a "brand" drug normally sold at prices multiples higher than generic substitutes, Hospira offered to sell Maxipime™ to Apotex's customers (and potential customers) at prices on par with (or lower than) Apotex's contract pricing for generic cefepime products.  Hospira was able to target Apotex's customers and match Apotex's prices only because Apotex disclosed confidential pricing information about Apotex's cefepime product to Hospira as it was required to under the terms of the Agreement.  This information was intended to assist the parties in pursuing their mutually advantageous commercialization and profit sharing agreement.  Instead, Hospira wrongfully used this information against Apotex as part of its scheme to evade its contractual obligations and compete directly against Apotex with its own version of cefepime.

83.     Hospira's ability to capture a large share of the cefepime market after the genericization of that market is entirely inconsistent with how such markets ordinarily function. As set forth above, because of generic substitution laws, once generic competition enters a particular drug market, generic products capture virtually the entire market, typically as much as 90 percent of sales after one year.  If Hospira had not artificially constricted the supply of generic cefepime and simultaneously marketed its branded cefepime product (Maxipime™) at low generic-like prices, sales of Maxipime™ would have been decimated and captured by generic alternatives because of generic substitution laws.

84.     Upon information and belief, including commercially available drug sales data, U.S. sales of Maxipime™ totaled more than $57.13 million between January 2014 and January 2017.

85.     Coupled with its failure to supply Apotex with Apotex's cefepime requirements and its decision to devote IKKT's manufacturing capacity to Maxipime™ rather than cefepime, Hospira's U.S. sales of Maxipime™ constitute a breach of the Agreement's exclusivity and non-compete provisions as well as its confidentiality provisions.  Hospira's conduct also constitutes fraud.  As such, Hospira has committed a Gross Breach pursuant to § 12.2(c)(i) and (iv) of the Agreement.

**ii.  Other Products**

86.     The pip/taz, ceftriaxone and cefoxitin families were other Product Families listed in Exhibit C(1) or C(2) to the Novation that Hospira agreed to manufacture exclusively for Apotex for marketing and sale to customers in the U.S.  In addition to agreeing to manufacture pip/taz, ceftriaxone and cefoxitin exclusively for Apotex, Hospira agreed that if it was unable to

manufacture sufficient quantities of these products for Apotex at IKKT, it would provide replacement product from a third-party source at its sole cost and expense.

87.     Hospira is contractually obligated, pursuant to the terms of the Agreement, as amended, to supply Apotex with its pip/taz, ceftriaxone and cefoxitin requirements.  Despite this agreement, since 2012, Hospira has systematically and continuously failed to supply Apotex with Apotex's requirements for pip/taz, ceftriaxone and cefoxitin.  A comprehensive list of pip/taz, ceftriaxone and cefoxitin purchase orders that Hospira failed timely to fulfill is included in the spreadsheet attached hereto as Exhibit 1.

88.     Hospira's failure to supply Apotex's pip/taz and ceftriaxone requirements was part of a deliberate strategy to sabotage Apotex's ability to commercialize these products in the U.S. while at the same time expand Hospira's own sales of competing pip/taz, ceftriaxone and cefoxitin products.

89.     On information and belief, at all times material to this dispute, Hospira has sold pip/taz and ceftriaxone in the U.S.  Further, upon information and belief, including commercially available drug sales data, U.S. sales of Hospira's pip/taz totaled more than $177.15 million between January 2014 and January 2017; and U.S. sales of Hospira's ceftriaxone totaled more than $92.08 million between January 2014 and January 2017.

90.     Hospira created market demand for competing pip/taz and ceftriaxone products by failing and refusing to manufacture these products for Apotex at IKKT.  Hospira knew that the effect of its conduct was to create unmet demand at the expense of Apotex because Apotex continuously informed Hospira that its failure to fulfill Apotex's supply requirements was causing Apotex to incur failure to supply penalties chargeable to Hospira.

91.     Hospira ensured that the market demand for pip/taz and ceftriaxone created by its improper failure to supply Apotex was met.  Hospira sourced these products from third parties and directly sold them in the U.S.  As Hospira did so, it failed to fill Apotex's unfilled orders with that same source of supply, as it was required to do under the Agreement.

92.     Hospira engaged in similar unfair competition with respect to the cefazolin product family.  As with the other cephalosporin products alleged above, between January of 2012 and March of 2016, Hospira violated the Agreement by systematically and continuously failing to supply Apotex with Apotex's requirements for cefazolin, as reflected in Exhibit 1 hereto.  While cefazolin was an Existing Competing Product that could be sold to a limited number of Permitted Customers, Hospira increased sales of cefazolin products to Permitted Customers (in this case, Hospira itself and Sandoz) by failing to fulfill Apotex' cefazolin requirements, thereby creating unmet market demand that Apotex would otherwise have filled, and thereby creating opportunities for the Permitted Customers to fill the unmet demand artificially created by Hospira's wrongful conduct.  In an effort to secure an even larger market share at Apotex's expense, upon information and belief, Hospira improperly sold cefazolin to Permitted Customers at a price that was lower than what the parties had agreed to for such sales, in violation of § 5 of Amendment No. 2 to the Agreement.  Hospira also failed to pay royalties to Apotex, in whole or in part, for such sales of cefazolin to Permitted Customers, in violation of Section 6 of Amendment No. 2 to the Agreement.  Upon information and belief, including commercially available drug sales data, sales by Hospira of cefazolin products in the U.S. totaled over $27.01  million between January 2014 and January 2017, and sales by Sandoz of cefazolin products in the U.S. totaled more than $30.46 million between January 2014 and January 2017.

93.     Hospira's decision to use the third-party supply of pip/taz, ceftriaxone,  cefoxitin and cefazolin in competition with Apotex rather than to use it to fill Apotex's unfilled orders was a knowing, intentional and willful breach of its obligation to prioritize Apotex supply requirements over its own requirements.

94.      Hospira used Apotex's confidential business information to obtain, directly or indirectly, sales of pip/taz, ceftriaxone, and cefazolin at the expense of Apotex.  Thus, Hospira solicited, and/or caused others to solicit, Apotex's contract customers, and directly or indirectly sold to these customers pip/taz, ceftriaxone, and cefazolin products in place of Apotex, knowing that Apotex could not fill its customers' orders for these products  because of Hospira's failure to supply these products to Apotex as required by the Agreement.  Hospira was able to target, directly and/or indirectly, Apotex's customers and match Apotex's prices only because Apotex disclosed confidential pricing information about Apotex's pip/taz, ceftriaxone, and cefazolin products to Hospira as it was required to under the terms of the Agreement.  This information was intended to assist the parties in pursuing their mutually advantageous commercialization and profit sharing agreement.  Instead, Hospira wrongfully used this information against Apotex as part of its scheme to evade its contractual obligations and compete directly or indirectly against Apotex with competing versions of pip/taz, ceftriaxone, and cefazolin.

95.     Hospira's conduct involving the failure to supply and sale of competitive pip/taz, ceftriaxone, cefoxitin and cefazolin products constitutes a breach of the Agreement's exclusivity and non-compete provisions and fraud.  As such, Hospira has committed Gross Breaches, pursuant to § 12.2(c)(i) and (iv) of the Agreement.

96.     More recently, Hospira's supply failures have been exacerbated by its inability to provide any pip/taz, cefoxitin, cefazolin and ceftriaxone products to Apotex due to regulatory

issues.  The FDA conducted an audit of Hospira's IKKT plant from March 27 to April 3, 2018, during which it found numerous issues with Hospira's manufacturing practices.  Following that audit, Hospira stopped all manufacturing and production processes at its IKKT plant, and suspended the release of any products currently in stock at the plant.  As a result, Hospira has not and will not be able to fulfill Apotex's orders for cefazolin, cefepime, ceftriaxone, cefoxitin and pip/taz for the foreseeable future.  In addition to its inability to fulfill current and future orders, Hospira has informed Apotex that Hospira will issue a recall for one or more of the products at issue previously supplied.  That recall process will impose significant expenses upon Apotex: (1) Apotex will incur administrative expenses associated with complying with the recall; and (2) Apotex will incur costs associated with the return of the recalled products and for storing such products.

## I.   Hospira Misleads Apotex While Sabotaging Apotex's Efforts to Commercialize the Products

97.     Employees of Hospira and Apotex were in regular contact with one another at all times relevant to this action and communicated at least weekly either by phone or by email about the supply issues described above.

98.     From 2011 through 2016, Gina Bahou of Apotex managed the day to day operational components of the relationship between Hospira and Apotex.

99.     From 2010 through 2016, Michael Ascenzo of Apotex was responsible for managing the business relationship between Apotex and Hospira.

100.    During the relevant time, both Ms. Bahou and Mr. Ascenzo were in regular communication by telephone and email with their counterparts at Hospira, including Mr. Kannan Venkatesan, Mr. Kabilan Alagiri, and Ms. Nikitha Suresh.

101.     From 2011 through 2016, Apotex and Hospira conducted bi-weekly or weekly telephonic meetings to discuss the status of the relationship, including the status of manufacturing operations at IKKT, pending orders, unfilled orders, and other supply issues.  Ms. Bahou participated in each of these meetings for Apotex.  Depending upon the time frame, either Mr. Alagiri or Ms. Suresh participated in these meetings on behalf of Hospira.  From time to time, Ms. Bahou communicated directly with Mr. Venkatesan as well, either during one of these meetings or otherwise.

102.     Because Hospira was consistently behind on its obligations to fulfill Apotex's pending purchase orders, these weekly meetings were routinely devoted to discussing the status of the outstanding orders, Hospira's willingness and ability to fulfill these orders, and Hospira's assurances about the efforts it was making to identify and obtain alternative sources of supplies for the Products it had failed to supply.

103.      During each of these meetings, and from time to time in email, Mr. Alagiri and/or Ms. Suresh attributed the supply problems to technical and/or manufacturing issues, to API supply problems, and/or to financial difficulties.  Mr. Alagiri and Ms. Suresh assured Ms. Bahou that Hospira was using its best efforts to resolve the manufacturing issues, that Hospira was seeking alternative sources of supplies, and that Hospira was fully committed to the parties' joint development efforts under the Agreement.  From time to time, Mr. Venkatesan made representations materially identical to those made by Mr. Alagiri and Ms. Suresh.

104.     Between 2010 and 2017, Mr. Ascenzo regularly communicated with Mr. Venkatesan about the business relationship between Apotex and Hospira.  These communications occurred on an ad hoc basis as necessitated by developments in the relationship. Most of the communications involved issues relating to Hospira's failure to fulfill Apotex's

requirements for the Products.  During each of these conversations, Mr. Venkatesan attributed

the supply problems to technical and/or manufacturing issues, to API supply problems, and/or to

Orchid's alleged financial difficulties.  Mr. Venkatesan assured Mr. Ascenzo that Hospira was

using its best efforts to resolve the manufacturing issues, that Hospira was seeking alternative

sources of supplies, and that Hospira was fully committed to the parties' joint development

efforts under the Agreements.

105.    In fact, Hospira was not committed to the parties' joint development efforts.  Nor

was Hospira using its best efforts to remedy its manufacturing issues and/or find alternative

sources of supply to fulfill Apotex's unfilled orders.  Rather, as described above, Hospira had

decided to compete with Apotex, and elected to engage in this competition by, among other

things, withholding supply of the Products from Apotex while simultaneously using Apotex's

confidential business information to sell competing products to Apotex's existing and

prospective customers.

106.    Despite  Hospira's obligation to  find replacement product to fulfill Apotex's

outstanding purchase orders, Hospira never complied with its contractual obligation to do so, and

instead, used product acquired from third parties to compete with Apotex.  Moreover, at no time

did either Mr. Alagiri, Ms. Suresh or Mr. Venkatesan ever inform Ms. Bahou that Hospira was

using Apotex's confidential information to compete with Apotex in this manner.

107.    In 2013, Apotex discovered that Hospira was manufacturing Maxipime™ at its

IKKT facility, notwithstanding that it was unable to fulfill Apotex's requirements for cefepime,

cefoxitin, ceftriaxone, cefazolin and/or pip/taz and that it attributed its inability to fulfill

Apotex's requirements to technical and manufacturing issues at IKKT.  Because of this

discovery, Apotex asked for a meeting with Hospira to discuss these issues.

108.    The meeting occurred at Apotex's offices in Toronto, Ontario, Canada on July 17, 2013.  Apotex was represented at the meeting by Michael Ascenzo, Gina Bahou, Jeff Hampton, Peter Eichinger, and Erin Organ.  David Powell and Kannan Venkatesan attended on behalf of Hospira.

109.    At the meeting, Mr. Powell and Mr. Venkatesan made a presentation to Apotex addressing the outstanding supply issues and distributed a power point presentation to all attendees.  Among other things, Hospira blamed its supply problems on issues related to its API supplier, Orchid, and to issues at IKKT.  Hospira acknowledged that it was manufacturing Maxipime™ at IKKT, but refused Apotex's demand that it use its manufacturing capacity to manufacture cefepime or any other of the Products.  Hospira instead advised Apotex that it was actively seeking alternate sources of supplies to fill Apotex's unfilled orders.  Hospira's representatives did not disclose that Hospira had already obtained alternative sources of supply for each of these products, and despite Hospira's obligation to find replacement product to fill Apotex's purchase orders, Hospira never did so and, instead, it used these third-party sourced products to compete with Apotex while armed with Apotex's confidential information.

110.    Apotex and Hospira conducted follow-up meetings in October, November and December of 2013.  These meetings were attended by Ray Coates, Stan Chomrak, Derick Gene, Michael Ascenzo, Gina Bahou, Erin Organ, and Peter Eichinger on behalf of Apotex.  Mr. Rathman and Mr. Venkatesan attended on behalf of Hospira.  At these meetings, Hospira made representations like those made at the July 2013 meeting.

**J.  <u>Harm to Apotex</u>**

111.    Because of Hospira's Gross Breaches of the Agreement, Apotex has suffered, and continues to incur, significant expenses, losses, and damages.

112.    Apotex incurred millions of dollars in failure to supply ("FTS") penalties and/or service level commitment ("SLC") penalties from customers Apotex could not supply because of Hospira's misconduct many of whom Hospira itself supplied instead.  These customers included regional and national accounts operating in nearly every class of trade—*e.g.*, long-term care facilities, pharmaceutical wholesalers and distributors, group purchasing organizations, and specialty infusion services providers.  Apotex's business relationships with these existing customers and prospective customers were harmed by Hospira's Gross Breaches of the Agreement, resulting in loss of goodwill, reputational harm, and lost opportunity costs.

113.    In addition to FTS/SLC penalties, Apotex incurred millions of dollars in added shipping costs.  Between April 2015 and March 2016 alone, for example, Apotex paid upward of $1.2 million for 105 air shipments of Products.  Because of Hospira's recurring (and ongoing) shipping delays, Apotex has paid at least $6 million to expedite Product shipments from IKKT to the United States for domestic distribution.

114.    To avoid incurring additional penalties and costs due to Hospira's inconsistent supply, Apotex was forced to reject numerous bids for Products from prospective customers. Between April and September 2016, for example, Apotex rejected more than $72 million in bids.

115.    Apotex has not been fully compensated by Hospira for the FTS/SLC and other penalties it has incurred.  Nor has Hospira repaid the millions of dollars Apotex spent responding to Hospira's supply failures and routine delays.  Finally, Hospira has refused to compensate Apotex for the business lost as a result of bids rejected for inability to sell, or business lost because of Hospira's own conduct in the marketplace.

**K.  Apotex Attempts to Mitigate Its Damages**

116.     Despite Hospira's repeated and continuous failure to meet its supply obligations under the Agreement, Apotex worked closely with Hospira to manage the supply issues within the context of the parties' Agreement.

117.     However, it became evident to all parties that Hospira would not remedy the supply issues, either because it could not (despite assurances to the contrary) or because it simply would not.

118.     As was its right under the Agreement, Apotex determined that it was in the best interests of all parties to the Agreement, including Hospira, for Apotex to attempt to mitigate the losses it was suffering as a result of Hospira's breaches of the Agreement.  As a result, Apotex commenced a search for alternative suppliers of the products subject to the Agreement.  Apotex elected to seek alternative sources of supply for these products only because of Hospira's breaches and solely in an effort to mitigate the damages it was suffering as a result of these breaches.

119.     Obtaining alternative suppliers for drug products manufactured for distribution in the United States is a complex and time consuming undertaking, in part because of regulatory requirements established by the FDA.  For example, any new supplier must be qualified under applicable regulations before drug products manufactured by the new supplier may be distributed by Apotex in the United States.

120.     Eventually, Apotex identified Qilu Pharmaceutical Co., Ltd. as a potential supplier for certain of the products subject to the Agreement.  After engaging in appropriate due diligence, Apotex arranged for Qilu to serve as an alternative supplier of the following products:

pip/taz powder for injection, cefazolin powder for injection, cefepime powder for injection, and ceftriaxone powder for injection.

121.   Apotex eventually stopped ordering some of the products at issue from Hospira, as reflected in the rolling forecasts that Apotex submitted to Hospira.

122.   Apotex continued, however, to purchase all pip/taz and cefoxitin products from Hospira under the terms of the Agreement, as well as the 10-gram strengths of cefazolin and ceftriaxone.  The supply problems continued.  As described above, however, following the FDA audit that concluded on April 3, 2018, Hospira shut down all manufacturing and production at its IKKT facility (the manufacturing plant at which Hospira manufactures pip/taz and all of the other products subject to this Agreement).  Hospira is therefore currently unable to supply Apotex with any of the drugs subject to the Agreement, including pip/taz, cefoxitin, cefazolin (10g strength) and ceftriaxone (10g strength).

123.   These recent events solidify and demonstrate even more strongly that Apotex appropriately sought to obtain alternative suppliers for the products subject to the Agreement. Had Apotex not obtained alternative suppliers for these products, Apotex would now be unable, solely as a result of Hospira's conduct, to sell any of the products subject to the Agreement in the United States market.

**L.   Apotex Engages Hospira in Dispute Resolution Efforts**

124.   Section 19.9 of the Agreement sets forth the mechanisms for addressing disputes arising from or relating to the subject matter of the Agreement, including Gross Breaches.  It directs the parties to

> endeavor to resolve in good faith any disputes or conflicts, failing which the Parties shall first submit such conflict or dispute to the [Executive Management Committee ("EMC")] for resolution.  If the EMC is unable to resolve the resolution with ten (10) business days thereafter (or such other time as may be mutually agreed upon), the conflict shall be referred to the respective Chief Executive Officers for formal negotiation and resolution . . . .

Agreement § 19.9(a).[17]  "If the matter remains unresolved thirty (30) business days thereafter (or such other time as may be mutually agreed upon), the conflict shall be submitted to arbitration . . . ." *Id.*

125.   Article 19 is clear, however, that "[a] party is not required to submit Gross Breaches to arbitration."  *Id.* § 19.9(a)(i) (emphasis added).  A "Gross Breach" is defined in pertinent part in the disjunctive as a (i) "[b]reach of exclusivity, that is, a willful, knowing or intentional breach of a material provision of Article 7 of this Agreement"; (ii) "systematic and consistent failure by [Hospira] to meet its supply obligations in such a manner that Apotex is denied the benefit of its bargain hereunder"; or (iii) "[w]illful, knowing or intentional fraud of any nature."  *Id.* § 12.2(c) (i), (ii), and (iv).

126.   Between June 2017 and March 2018, Apotex engaged Hospira in a good-faith effort to resolve Gross Breaches and other misconduct alleged herein as required by § 19.9 of the Agreement.

127.   Apotex exhausted the informal dispute resolution steps of § 19.9, prompting Apotex to commence the present action.

---

[17] The EMC's composition and functions are described in Article 8 of the Agreement.

## V.      FRAUDULENT CONCEALMENT AND TOLLING OF LIMITATIONS PERIODS

128.    Hospira has concealed from Apotex the details of its breaches of contract, fraud and unfair and deceptive acts and practices during the time Hospira engaged in that conduct so as to avoid detection and cessation of its ill-gotten profits and benefits.

129.    Given Hospira's concealment of the unlawful conduct, including but not limited to its express misrepresentations to the contrary, Apotex had no way of knowing that Hospira was engaging in such conduct to its detriment, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence.

130.    By reason of the foregoing, Apotex's claims are timely under any applicable statute of limitations (as tolled by the filing of this Complaint) pursuant to the doctrine of fraudulent concealment.

## VI.      COUNTS

### COUNT I
### (Breach of Contract)

131.    Apotex realleges and incorporates by reference paragraphs 1 through 130 of this Complaint.

132.    The Agreement between Apotex and Orchid and, following execution of the Novation, between Apotex and Hospira, created legally enforceable rights and obligations.

133.    To the extent not thwarted by Hospira's Gross Breaches, Apotex has at all times performed and fulfilled its purchase, commercialization, and other obligations under the Agreement.

134.    Hospira breached the Agreement by (i) making some or all of the  Products available to third parties in the Territory (in violation of §§ 1(J) and 5 of the Novation); (ii) systematically and consistently failing to timely supply Apotex with Product in the quantities

specified in Apotex's purchase orders (in violation of Article 5 of the Agreement as amended by the Novation); (iii) secretly using Apotex's confidential business information to compete with Apotex by communicating with and offering Products to Apotex's customers at lower prices (in violation of Article 18 of the Agreement and § 4 of the Novation); (iv) selling cefazolin products to Apotex competitors which were Permitted Customers under the Agreement at prices lower than required by Amendment No. 2 to the Agreement, and failing to pay royalties, in whole or in part, due to Apotex from such sales; (v) failing to prioritize to supply Apotex (in violation of § 1(E) of the Novation); (vi) failing to obtain alternative sources from third parties when it could not manufacture sufficient Product to supply Apotex (in violation of § 1(H) of the Novation); and (vii) entering into contracts, commitments or agreements that impaired or inhibited Hospira's ability to perform its obligations under the Agreement (in violation of § 14.2(a) of the Agreement).

135.   Apotex has sustained and continues to sustain economic and noneconomic damages as a result of Hospira's breaches of the Agreement.

## COUNT II
### (Florida Deceptive and Unfair Trade Practices Act – Damages)

136.   Apotex realleges and incorporates by reference paragraphs 1 through 135 of this Complaint.

137.   Section 501.204(1) of FDUTPA declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

138.   At all times relevant hereto, Apotex was and is a consumer pursuant to FDUTPA § 501.203(7).

139.     At all times relevant hereto, Hospira was and is a person or entity engaged in "trade or commerce" pursuant to FDUTPA §501.203(8).

140.     Hospira violated § 501.204(1) of FDUTPA by engaging in unfair methods of competition and unfair and deceptive acts or practices, the impact of which substantially occurred in the State of Florida and/or caused harm to Apotex in the State of Florida and elsewhere.

141.     In particular, Hospira willfully breached its contractual supply obligations at the same time it secretly was competing with Apotex to capture Apotex' market share in Florida and throughout the United States, at least with respect to the Existing Competing Products and Products comprising the cefepime, cefoxitin, and pip/taz product families.  Moreover, Hospira converted Apotex's trade secrets (the highly sensitive pricing information Apotex furnished to Hospira in accordance with the profit sharing arrangements in the Agreement and other highly confidential information about customers and customer demand) and used those secrets against Apotex in competition with Apotex by "price-matching" or undercutting Apotex's prices in the market.

142.     Hospira's communications (including its misrepresentations) reached and were relied upon by Apotex's marketing and sales operations in Florida.

143.     Apotex has sustained and continues to sustain actual damages and competitive harm because of Hospira's violations of FDUTPA.

## COUNT III
### (Intentional Misrepresentation)

144.     Apotex realleges and incorporates by reference paragraphs 1 through 143 of this Complaint.

145.     Hospira made materially false statements to Apotex intending to defraud Apotex; viz., Hospira intentionally misrepresented to Apotex that it (1) had the ability to and would meet its contractual obligations to fully and timely supply conforming Products to Apotex in the quantities specified in Apotex's purchase orders; and (2) intended to and did comply with the exclusivity, non-compete, and other marketing and/or sales restrictions applicable to the Products, including (without limitation) the competing generic products comprising the cefepime, cefoxitin, ceftriaxone and pip/taz product families.

146.     Hospira also made materially false statements to and/or intentionally withheld material information from Apotex regarding the reasons for its inability (or unwillingness) to meet its contractual obligations.

147.     Apotex reasonably relied on Hospira's false statements, including (without limitation) repeated assurances regarding API availability and Product delivery and compliance with the Agreement's warranties, covenants, and limitations.  Apotex's reliance was reasonable because it lacked knowledge (and Hospira possessed exclusive knowledge) of the competitive scheme by which Hospira failed to honor the Agreement's exclusivity and non-compete restrictions.

148.     Apotex has sustained and continues to sustain economic and noneconomic damages because of Hospira's past and ongoing fraud.

## COUNT IV
### (Fraudulent Concealment)

149.     Apotex realleges and incorporates by reference paragraphs 1 through 148 of this Complaint.

150.     The relationship between Apotex and Hospira created an affirmative duty to speak truthfully.

151.     At all relevant times, Hospira had superior knowledge of material facts and was required to disclose them to Apotex, because it knew Apotex was acting on the basis of mistaken knowledge.  Specifically, Hospira knew it (1) was marketing and selling competing versions of the Products (*e.g.*, cefoxitin, ceftriaxone, pip/taz, and Maxipime™) to third parties in the Territory, including customers and competitors of Apotex; and (2) could not or would not meet its contractual obligations to fully and timely supply conforming Products to Apotex in the quantities it specified.  At no time did Hospira disclose these facts to Apotex, however.

152.     When Hospira did speak, it withheld from Apotex the fact of the competitive scheme by which it failed to honor the Agreement's exclusivity, non-compete, and other marketing and/or sales restrictions.

153.     Hospira was motivated by concrete benefits that could be realized by its wrongful nondisclosure; namely, Hospira breached its contractual supply obligations at the same time it secretly was competing with Apotex to capture its market share in the Territory.  Further, because Apotex was contractually bound to purchase the Products and API from Hospira, Hospira had the opportunity to (and did) achieve these concrete benefits by the means alleged.

154.     Apotex relied on Hospira to fully and timely supply conforming Products to Apotex in the quantities it specified in order for Apotex to commercialize the Products to current and prospective customers in the Territory.  Apotex's reliance was reasonable because it lacked knowledge (and Hospira possessed exclusive knowledge) of Hospira's competitive scheme.

155.     Because Hospira intentionally suppressed the fact of its scheme, Apotex has sustained and continues to sustain economic and noneconomic damages, including but not limited to loss of goodwill, reputational harm, and lost opportunity costs.

## COUNT V
### (Negligent Misrepresentation)

156.    Apotex realleges and incorporates by reference paragraphs 1 through 155 of this Complaint.

157.    By virtue of the Agreement, a special relationship existed between Apotex and Hospira by privity of contract.  Such relationship imposed on Hospira a duty to provide Apotex with correct information.

158.    Hospira separately made a false representation that it should have known was incorrect each time it represented it (1) had the ability and would meet its contractual obligations to fully and timely supply conforming Products to Apotex in the quantities specified in Apotex's purchase orders; and (2) intended to and did comply with the exclusivity, non-compete, and other marketing and/or sales restrictions set forth in the Agreement or Novation.

159.    The information in and substance of Hospira's representations was known by Hospira to be desired by Apotex for a serious purpose; indeed, such information concerned the core services and benefits Apotex had contracted to receive.

160.    Apotex intended to and did reasonably rely and act upon Hospira's false representations to its detriment because Apotex represented to current and prospective customers it had and could sell the Products/Product Families that Hospira agreed to exclusively source to Apotex.

161.    Apotex has sustained and continues to sustain economic and noneconomic damages because of Hospira's negligent misrepresentations concerning its compliance with and performance under the terms of the Agreement.

## COUNT VI
### (Tortious Interference with Business Relations)

162.     Apotex realleges and incorporates by reference paragraphs 1 through 161 of this Complaint.

163.     Apotex entered into the Agreement to jointly develop and commercialize the Products subject to the Agreement and Novation in the U.S., to share the costs of the development of the Products, and to share the profits earned by commercializing the Products in the U.S.  Apotex agreed to purchase the Products exclusively from Orchid and Orchid's successor, Hospira, in order to obtain a consistent source of supply for the Products and to ensure that Orchid, and its successor Hospira, were fully committed to the joint development and commercialization project.

164.     To comply with its commercialization obligations under the Agreement, Apotex marketed and sold the Products to existing and prospective U.S. customers.

165.     As alleged above, notwithstanding its agreement to the contrary, Hospira systematically and consistently failed to supply Apotex with its requirements of the Products. This failure to supply Apotex interfered with Apotex's customer relationships and created unmet demand for the Products.  Therefore, Hospira had notice and knowledge of the actual business relationships Apotex forged with its customers.

166.     Indeed, Hospira had notice and knowledge of the actual business relationships forged by Apotex based on, among other things, communications concerning Hospira's late deliverables and FTS penalties to Apotex.

167.     Despite its knowledge of these relationships, Hospira engaged in dishonest, unfair, fraudulent and/or improper conduct by selling or otherwise making available to third parties in the Territory the Products and/or API, which Hospira was obligated to exclusively source to Apotex (or the Permitted Customers).  These include (without limitation) the

competing generic products comprising the cefepime, cefoxitin, ceftriaxone and pip/taz product families. Hospira failed to meet its supply obligations to Apotex as set forth in the Agreement, and it misrepresented the real reason for its failures to supply – which was to compete with Apotex by supplying Product to Apotex's customers. Hospira compounded its improper conduct by converting Apotex's proprietary business information and using it in its competition with Apotex.

168.    Hospira's misconduct constitutes tortious interference with business relations because, but for Hospira's intentional and wrongful acts, Apotex's relationship with its customers would not have been injured.

## COUNT VII
### (Tortious Interference with Prospective Business Relations)

169.    Apotex realleges and incorporates by reference paragraphs 1 through 168 of this Complaint.

170.    Apotex entered into the Agreement to jointly develop and commercialize the Products, to share the costs of the development of the Products, and to share the profits earned by commercializing the Products in the U.S. Apotex agreed to purchase the Products exclusively from Orchid and Orchid's successor, Hospira, in order to obtain a consistent source of supply for the Products and to ensure that Orchid, and its successor Hospira, were fully committed to the joint development and commercialization project.

171.    To comply with its commercialization obligations under the Agreement, Apotex marketed and sold the Products to existing and prospective U.S. customers.

172.    As alleged above, notwithstanding its agreement to the contrary, Hospira systematically and consistently failed to supply Apotex with its requirements of the Products. This failure to supply Apotex interfered with Apotex's customer relationships and created unmet

45

demand for the Products, impairing Apotex's ability to supply actual and prospective customers. Therefore, Hospira had notice and knowledge of the Apotex's prospective business relationships with customers.

173.    Indeed, Hospira had notice and knowledge of the potential business relationships forged by Apotex based on, among other things, communications concerning forecasted demand for delivery of the Products by Apotex.

174.    Despite its knowledge of these prospective business relationships, Hospira engaged in dishonest, unfair, fraudulent and/or improper conduct by selling or otherwise making available to third parties in the Territory the Products and/or API, which Hospira previously agreed to exclusively source to Apotex (or the Permitted Customers).  These include (without limitation) the competing generic products comprising the cefepime, cefoxitin, ceftriaxone and pip/taz product families.  Hospira thereafter failed to meet its supply obligations to Apotex as set forth in the Agreement, and it misrepresented the real reason for its failures to supply – which was to compete with Apotex by supplying Product to Apotex's customers.  Hospira compounded its improper conduct by converting Apotex's proprietary business information and using it in its competition with Apotex.

175.    Hospira's failure and/or unwillingness to meet its contractual obligations to Apotex interfered with and harmed the business relationships Apotex could have formed with prospective customers.  Indeed, Hospira's failures caused Apotex to forego submitting bids to supply Products to prospective customers, which would have been worth millions of dollars.

176.    Hospira's misconduct constitutes tortious interference with prospective business relations because, but for Hospira's intentional and wrongful acts, Apotex would have entered into or extended contractual relationships with one or more third parties.

## COUNT VIII
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

177.    Apotex realleges and incorporates by reference paragraphs 1 through 176 of this Complaint.

178.    Apotex entered into the Agreement to jointly develop and commercialize the Products, to share the costs of the development of these products, and to share the profits earned by commercializing the Products in the United States.  Apotex agreed to purchase the Products exclusively from Orchid and Orchid's successor, Hospira, in order to obtain a consistent source of supply for the Products and to ensure that Orchid, and its successor Hospira, were fully committed to the joint development and commercialization project.  Hospira's course of conduct described herein effectively prevented Apotex from obtaining the benefit of its bargain.

179.    The Agreement's supply, exclusivity and non-compete provisions encompass all Products (as that term is defined in the Agreement).

180.    As alleged above, notwithstanding its agreement to the contrary, Hospira systematically and consistently failed to supply Apotex with its requirements of the Products. This failure to supply Apotex interfered with Apotex's customer relationships and created unmet demand for the Products subject to the Agreement.  Hospira was aware of these relationships and the unmet demand and rather than supply Apotex requirements, Hospira elected to compete with Apotex by supplying the Products directly to Apotex's existing and prospective customers. Hospira compounded its improper conduct by converting Apotex's proprietary business information and using it against Apotex in its competition with Apotex, thereby gaining an improper advantage in its efforts to compete with Apotex in the markets for the Existing Competing Products and Products comprising the cefepime, cefoxitin, ceftriaxone and pip/taz Product Families.

47

181.    To facilitate its decision to sell Products in competition with Apotex, Hospira failed to supply and/or diverted the supply of such Products to itself and others.  Because it did so, Hospira could not and did not satisfy its contractual supply obligations to Apotex.

182.    Hospira's course of conduct, as described herein, was designed to evade its contractual obligations and restrictions under the Agreement.

183.    Hospira's course of conduct, as described herein, has fraudulently and unreasonably interfered with Apotex's ability to obtain the benefit of its bargain under the Agreement insofar as it has artificially restricted Apotex's supply of the Products while Hospira obtained market share at Apotex's expense.

184.    Hospira's conduct was prompted by and reflects a self-interested and dishonest motive.

185.    Such conduct constitutes a breach of the covenant of good faith and fair dealing implied in the Agreement.

**COUNT IX**
**(Unjust Enrichment)**

186.    Apotex realleges and incorporates by reference paragraphs 1 through 185 of this Complaint.

187.    By unfairly competing with Apotex under the guise of selling a brand-name drug, *e.g.*, Maxipime™, and selling competing generic cephalosporin and pip/taz products, Hospira enjoyed greater business revenue in U.S. markets.

188.    Hospira was enriched at the expense of Apotex.

189.    Because Hospira enriched itself by deliberately denying Apotex the exclusive right to sell the Products in the Territory, equity and good conscience dictate that Hospira should return its ill-gotten profits to Apotex.

48

## VII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Apotex prays for judgment against Hospira that:

1.        Hospira be required to pay to Apotex the following:

        a.        In accordance with the common law of the State of New York, direct damages, restitution and disgorgement of profits, lost profits from business interruption, and other special or indirect damages and losses Apotex sustained as a natural and probable consequence of Hospira's misconduct, including punitive damages in a sum sufficient to deter future wrongdoing.

        b.        In accordance with Fla. Stat. § 501.211, actual damages plus attorneys' fees and court costs as provided in § 501.2105, as well as punitive damages to the extent permitted under §§ 501.201 et seq. in a sum sufficient to deter future unlawful acts and practices.

2.        awards Apotex such other and further relief as the Court deems just and equitable, including but not limited to attorneys' fees and costs.

## VIII.   DEMAND FOR JURY TRIAL

Apotex hereby demands a trial by jury on all issues so triable.

Dated: New York, New York
      June 1, 2018

    Respectfully submitted,

    FOLEY & LARDNER LLP

    By: _____

    Sara P. Madavo
    Foley & Lardner LLP
    90 Park Avenue
    New York, New York 10016
    Telephone:  (212) 338-3626
    Facsimile:  (212) 682-2329
    smadavo@foley.com

    James W. Matthews (*pro hac vice* motion to be filed)
    Katy E. Koski (*pro hac vice* motion to be filed)
    Redi Kasollja *(pro hac vice* motion to be filed)
    Foley & Lardner LLP
    111 Hungtington Avenue, Suite 2500
    Boston, MA 02199-7610
    Tel: (617) 342-4000
    jmatthews@foley.com
    kkoski@foley.com
    rkasollja@foley.com

    *Attorneys for Plaintiff*

4815-9350-4102.3