UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                         :

APOTEX CORP.,
                                         :

                   Plaintiff,           :

                                         :                18-CV-4903 (JMF)

        -v-                           :

                                         :                OPINION AND ORDER

HOSPIRA HEALTHCARE INDIA PRIVATE LTD. and :
HOSPIRA, INC.,
                                         :

                 Defendants.      :

                                         :
-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

        Plaintiff Apotex Corp. ("Apotex") brings claims against Defendants Hospira Healthcare

India Private Ltd. ("Hospira India") and Hospira, Inc. (together with Hospira India, "Hospira"),

successors of an entity that had agreed with Apotex to jointly develop and market certain generic

pharmaceutical products for sale in the United States.  In an earlier Opinion and Order, the Court

granted in part and denied in part a motion to dismiss Apotex's claims, and granted Apotex leave

to file a second amended complaint.  *See Apotex Corp. v. Hospira Healthcare India Private Ltd.*,

No. 18-CV-4903 (JMF), 2019 WL 3066328 (S.D.N.Y. July 12, 2019).  Thereafter, Apotex filed

the operative Second Amended Complaint, which includes claims against Hospira for breach of

contract; unfair competition under the Florida Deceptive and Unfair Trade Practices Act

("FDUTPA"), Fla. Stat. Ann. §§ 501.201 *et seq.*; and monopolization and attempted

monopolization under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.  ECF No. 74

("SAC").  Hospira now moves, pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure, to dismiss Apotex's antitrust claims and its claim for punitive damages for breach of

contract.  ECF Nos. 84-85.  For the reasons that follow, Hospira's motion is GRANTED as to the

antitrust claims. The Court reserves judgment on the punitive damages claim pending further briefing on subject-matter jurisdiction in light of the dismissal of the antitrust claims.

## BACKGROUND

The relevant background is set forth in the Court's prior Opinion and will be summarized only briefly here. In 2003, Apotex entered into an agreement — the Development, Manufacturing, Supply and Commercialization Agreement ("Agreement"), *see* ECF No. 39, at 5-8 — with Hospira's predecessor, Orchid Chemicals and Pharmaceuticals, Ltd. ("Orchid"). SAC ¶ 1. The Agreement provided that Orchid would supply Apotex with certain drugs, including cefazolin, ceftriaxone, cefoxitin, cefepime, and piperacillin-tazobactam ("pip/taz"). *Id.* In addition, the Agreement prohibited Orchid from supplying the covered drugs to Apotex's competitors and from directly competing with Apotex in the United States. *Id.* ¶¶ 47-50; *see also id.* ¶ 53 (describing amendment creating an exception for certain customers). On March 23, 2010, Hospira succeeded Orchid through a contractual novation ("Novation"), *see* ECF No. 39, at 11-13, and thus became subject to the Agreement's exclusive supply provision and other restrictions on competition with Apotex, *see* SAC ¶¶ 58-64.

On June 1, 2018, Apotex sued Hospira India for breach of the Agreement and Novation and a variety of related claims. *See* ECF No. 1. On July 12, 2019, the Court granted in part and denied in part a motion to dismiss these claims. ECF No. 70. In brief, the Court ruled that Apotex's three fraud-based claims and claims for unfair competition, breach of the implied covenant of good faith and fair dealing, tortious interference, and unjust enrichment failed as a matter of law, but its claim under the FDUTPA did not. *See* 2019 WL 3066328, at *4-8. In addition, the Court ruled that Apotex may seek only benefit-of-the-bargain damages, attorney's fees, and costs for its FDUTPA claim; that Apotex is bound by the Agreement and Novation's

limitation on damages; and that it was ambiguous whether the limitation on damages precluded lost profit damages for Apotex's contract claim. *Id.* at \*8-9. Most relevant for present purposes, the Court reserved judgment on whether Apotex adequately pleaded a claim for punitive damages for breach of contract and whether any such claim was barred by the limitation on damages, *see id.* at \*8 n.5, and granted Apotex leave to file a second amended complaint adding "new allegations and claims . . . regarding monopolization and attempted monopolization," *id.* at \*10. Thereafter, Apotex filed the Second Amended Complaint, adding Hospira, Inc. as a new Defendant and alleging claims under the Sherman Antitrust Act. *See* SAC ¶¶ 169-192.

The Second Amended Complaint alleges that Hospira monopolized the U.S. market for cefepime, a type of cephalosporin antibiotic, and attempted to monopolize the U.S. market for several other drugs. *See* SAC ¶¶ 169-192. Apotex alleges that Hospira did so by breaching its obligations under the parties' agreement to act as Apotex's exclusive supplier for these drugs, and by selling its own version of the drugs to Apotex's competitors and directly to Apotex's customers. *See id.* ¶¶ 176, 184. For example, Hospira allegedly cut off Apotex's supply of cefepime and manufactured and sold its own brand-name version of the drug, Maxipime, to Apotex's competitors and customers. *Id.* at ¶¶ 176, 180. Hospira allegedly used "confidential average price" information obtained through the parties' partnership to sell Maxipime "on par with or near Apotex's contract price." *Id.* at ¶ 176(d). Through this alleged scheme, Hospira's share of the cefepime market "soared from negligible to a majority market share," reaching 56.58% in August 2016. *Id.* at ¶¶ 173, 178. In addition, Hospira ultimately closed "the only facility at which it manufactures Products for Apotex," known as the IKKT facility, leaving Apotex entirely "unable to compete." *Id.* at ¶¶ 8, 203. Hospira allegedly used the same scheme in an attempt to monopolize the U.S. market for other drugs — namely, ceftriaxone, cefazolin,

cefoxitin, and pip/taz. *See id.* at ¶¶ 1, 189-91. Hospira allegedly gained 43.75% of the market for ceftriaxone "as of January 2017," and 30.76% of the market for cefazolin "as of January 2016." *Id.* ¶ 191. (It is unclear what, if any, market share Hospira gained for the other drugs.) On the basis of these allegations, Apotex now seeks, *inter alia*, treble damages, plus costs and attorney's fees, for the alleged antitrust violations and punitive damages for the alleged breach of contract. *See* SAC at Prayer for Relief ¶ 1(a), (c).[1]

## LEGAL STANDARDS

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all facts set forth in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See, e.g.*, *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 58 (2d Cir. 2019). A claim will survive a Rule 12(b)(6) motion, however, only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). A plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555. If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

---

[1]     Apotex seeks punitive damages solely in connection with its contract claims. *See* ECF No. 87, at 2 n.2. Thus, the Court need not and does not address Hospira's motion to the extent that it seeks dismissal of a claim for punitive damages under the FDUTPA.

## DISCUSSION

The Court begins with the motion to dismiss Apotex's antitrust claims, its sole federal claims. Section 2 of the Sherman Antitrust Act prohibits "monopoliz[ing], or attempt[ing] to monopolize . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2. A claim of monopolization "requires, in addition to the possession of monopoly power in the relevant market, the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014) (internal quotation marks omitted) (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004)). "To state an attempted monopolization claim, a plaintiff must establish '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" *PepsiCo., Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)). The two claims "are substantially identical, with the exception that attempted monopolization requires a showing of specific intent to monopolize." *New York v. Actavis, PLC*, No. 14-CV-7473 (RWS), 2014 WL 7015198, at *35 (S.D.N.Y. Dec. 11, 2014), *aff'd sub nom. New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015).

Hospira argues that Apotex's claims fail for at least two reasons: first, because Apotex fails to make a showing of "anticompetitive conduct," ECF No. 85 ("Defs.' Mem."), at 10-14;

and second, because Apotex fails to plausibly allege that Hospira actually monopolized or dangerously threatened to do so, *id.* 19-22.[2]  The Court agrees on both fronts.

## A. Anticompetitive Conduct

A claim under the Sherman Act must allege anticompetitive conduct, as federal antitrust laws were "enacted for the protection of competition not competitors." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (internal quotation marks omitted). "[A]nticompetitive conduct is conduct without a legitimate business purpose that makes sense only because it eliminates competition." *In re Adderall*, 754 F.3d at 133 (internal quotation marks omitted).  A "prototypical valid business purpose" is expanding into a new market to compete on the basis of increased efficiency. *See Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 124-25 (2d Cir. 2007) (holding that a manufacturer's breach of a distributorship agreement was not anticompetitive because the manufacturer "expected to perform the second level service more efficiently than the old trading partners").  Conduct undertaken for such a purpose cannot, as a matter of law, be the basis for an antitrust claim.

In this case, Apotex's own allegations reveal that Hospira's conduct was undertaken for legitimate, pro-competitive purposes.  The primary conduct alleged in the Second Amended Complaint is Hospira's decision to breach the exclusive supplier agreement with Apotex in order to compete directly with Apotex and to supply Apotex's competitors. *See, e.g.*, SAC ¶¶ 84 ("Hospira has sold or otherwise supplied to third parties in the Territory certain drugs that

---

[2]  Hospira also contends that Apotex fails to allege antitrust injury and, by extension, antitrust standing. *See* Defs.' Mem. 8-10; ECF No. 88 ("Defs.' Reply"), at 2-3 & 3 n.5.  Despite its name, antitrust standing is "not jurisdictional in nature but rather relates to the merits of a claim." *Bilinski v. Keith Haring Found., Inc.*, 96 F. Supp. 3d 35, 43 n.7 (S.D.N.Y. 2015).  Accordingly, the Court need not and does not address it here. *See, e.g.*, *Biocad JSC v. F. Hoffmann-La Roche, Ltd.*, 942 F.3d 88, 94 n.5 (2d Cir. 2019).

directly compete with Apotex's sale of the Products."), 88 (describing "Hospira's deliberate decision to divert supply of Products to its own use in competition with Apotex"); *see also id.* ¶ 2 (alleging that "Hospira did compete with Apotex in the United States pharmaceuticals market" prior to the parties' agreement). That decision is consistent with competitive business behavior: "Like any seller of a product," Hospira "would prefer multiple competing buyers unless an exclusive distributorship arrangement provides other benefits." *E&L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 30 (2d Cir. 2006). Engaging in competition was especially rational given Hospira's competitive advantage over Apotex. Apotex alleges that "many" firms produce "virtually identical drugs," which means that firms must compete on factors like "consistency of supply." *Id.* ¶¶ 39-40. Hospira, as a manufacturer, has direct access to a consistent supply of products, unlike a reseller like Apotex. Hospira's decision to capitalize on this advantage is not the type of anticompetitive conduct prohibited by federal antitrust laws. *See Port Dock*, 507 F.3d at 125 ("[A] complaint pleading that a defendant expanded vertically and as a result, decided to discontinue doing business with its erstwhile trading partners at the next level down, does not plead an actionable refusal to deal.").

In arguing otherwise, Apotex asserts that "there is no legitimate business justification for a campaign to withhold irreplaceable supply from a competitor, misappropriate its confidential information to target customers and sully the competitor's reputation so customers will abandon it." ECF No. 87 ("Pl.'s Opp."), at 14. In support, Apotex relies heavily on *Associated Radio Service Co. v. Page Airways, Inc.*, 624 F.2d 1342 (5th Cir. 1980), for the proposition that "some unfair business practices can be exclusionary." Pl.'s Opp. 15 (quoting *Page Airways, Inc.*, 624 F.2d at 1354). But as the Fifth Circuit has stated more recently, the "distinction between unfair conduct and anticompetitive conduct is critical to maintain because the antitrust laws 'do not

7

create a federal law of unfair competition.'" *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 892 (5th Cir. 2016) (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) (noting that "*Brooke Grp.*, of course, postdates *Page Airways*"). The conduct that Apotex alleges may well give rise to claims for unfair competition and breach of contract, but it does not give rise to an antitrust claim. *See La. Wholesale Drug Co. v. Shire LLC*, 929 F. Supp. 2d 256, 262 (S.D.N.Y. 2013) ("[N]ot every sharp-elbowed business practice — though potentially wrongful as a breach of contract or even fraud — necessarily amounts to an antitrust violation."); *see also, e.g.*, *Hunt v. Mobil Oil Corp.*, 465 F. Supp. 195, 235 n.102 (S.D.N.Y. 1978) ("[T]he antitrust laws are not properly invoked every time a party to a contract claims injury because of another party's alleged nonperformance of the agreement."), *aff'd*, 610 F.2d 806 (2d Cir. 1979).

Citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), Apotex also argues that Hospira's conduct constitutes an anticompetitive refusal to deal. Pl.'s Opp. 16-19. Private businesses, however, enjoy a "long recognized right" to exercise "independent discretion as to the parties with whom [they] will deal." *In re Adderall*, 754 F.3d at 134 (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). *Aspen Skiing* established a "limited" exception to that principle for situations in which the "unilateral termination of a voluntary (and thus presumably profitable) course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end." *Trinko*, 540 U.S. at 409 (emphasis omitted); *see Charych v. Siriusware, Inc.*, No. 17-CV-468 (JS) (GRB), 2018 WL 4870906, at *7 (E.D.N.Y. July 30, 2018) (noting that the *Aspen Skiing* exception is "narrow"). In that case, the Supreme Court upheld an antitrust verdict against a ski resort operator that had discontinued a longstanding agreement with a smaller rival to jointly sell "all-Aspen" resort access tickets. 472

U.S. at 604, 611.  The Court noted that such a decision was "not necessarily anticompetitive,"
but found that evidence in the record supported the jury's conclusion that "there were no valid
business reasons for the refusal" to deal except to eliminate competition.  *Id.* at 604, 610-11.
Because the larger ski resort's decision "was not motivated by efficiency concerns," the Court
concluded that the resort was "sacrificing short-run benefits and consumer goodwill in exchange
for a perceived long-run impact on its smaller rival."  *Id.* at 610-11.

　　　　Two key elements of *Aspen Skiing* are absent from this case.  First, *Aspen Skiing*'s
holding was driven by the Court's conclusion that the defendant had discontinued its prior,
"presumably profitable" course of dealing in an effort "to forsake short-term profits to achieve an
anticompetitive end."  *Trinko*, 540 U.S. at 409; *see Aspen Skiing*, 472 U.S. at 610-11.  Here, by
contrast, Apotex affirmatively alleges that Hospira breached its contractual obligations in pursuit
of competitive profits.  *See* SAC ¶ 4 (alleging that Hospira was "using its breaches of the
Agreement as a means to capture for itself all of the very profits the parties had agreed to
share").  A party does not — at least *as a matter of antitrust law* — have a duty to deal with a
competitor when, as here, greater profits are available through direct competition.  *See, e.g.*, *In re
Adderall*, 754 F.3d at 131, 134-35 (dismissing antitrust claims based on a drug maker's breach of
"*un*profitable" agreements to "give its competitors both the rights and the supplies necessary to
participate in the market").

　　　　Second, the *Aspen Skiing* decision relied on the fact that the defendant could use its
significant market power to exclude its smaller rival.  *See In re Adderall*, 754 F.3d at 134 (noting
that *Aspen Skiing* held "that a business *with market power* may be subject to a duty to deal with a
smaller competitor" (emphasis added)).  Because the defendant in *Aspen Skiing* controlled three
of the four resorts in the area, the defendant was able to sharply curb business for its competitor

by selling a "3-area" ticket to its own resorts while denying the smaller operator access, even at retail price. *Aspen Skiing*, 472 U.S. at 610. Here, by contrast, until Hospira allegedly breached the parties' contract, Hospira had almost no presence in the market for cefepime, as Hospira was contractually barred from competing with Apotex and Hospira's brand drug was subject to "generic substitution laws," which ensured that "sales . . . were negligible." SAC ¶¶ 63, 93. In these conditions, Hospira's conduct does not suggest an anticompetitive motive. It suggests the opposite: that Hospira sought to, and did, participate in the market as a competitor.

Finally, Apotex argues that, "[i]n this Circuit, the bar for showing that a party has engaged in unlawful anticompetitive conduct 'is a low one.'" Pl.'s Opp. 14 (quoting *Provepharm, Inc. v. Akorn, Inc.*, No. 17-CV-7087 (SJF) (AKT), 2019 WL 2443185, at *10 (E.D.N.Y. June 11, 2019)). That may be true, but it does not salvage Apotex's claims because Apotex "fails to allege any facts regarding monopolistic conduct — as opposed to selective aggressive conduct against a rival." *Full Circle United, LLC v. Skee-Ball, Inc.*, Nos. 11-CV-5476 (LB), 11-CV-6277 (LB), 2014 WL 12829195, at *11 (E.D.N.Y. May 13, 2014) ("The gravamen of [an antitrust] offense is *not* the enlargement of the defendant's market share at the plaintiff's expense or even the destruction of plaintiff by unfair means." (alterations omitted)). That is, Apotex does not meet the bar, however low it may be. *See Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 60 n.2 (S.D.N.Y. 2016) ("[A] competitor cannot use the antitrust laws to recover lost profits as a result of being confronted with an *increase* in competition."). In short, Apotex's antitrust claims fail because the Second Amended Complaint alleges harm to a competitor, not harm to competition — the *sine qua non* of an antitrust claim.

## B. Actual or Threatened Monopolization

Apotex's antitrust claims fail for a second reason as well: because the Second Amended Complaint makes clear that Hospira never acquired monopolistic market power and that there was no dangerous probability Hospira would acquire it. *See Spectrum Sports*, 506 U.S. at 456. "Market power is the ability: '(1) to price substantially above the competitive level *and* (2) to persist in doing so for a significant period without erosion by new entry or expansion.'" *Commercial Data Servers, Inc. v. Int'l Bus. Machines Corp.*, 262 F. Supp. 2d 50, 73 (S.D.N.Y. 2003) (quoting *AD/SAT, Div. of Skylight, Inc. v. Assoc. Press*, 181 F.3d 21, 227 (2d Cir. 1999) (per curiam)). Market power "may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 98 (2d Cir. 1998).

To allege market power, a party first needs to define the relevant market. "The relevant market is defined as all products reasonably interchangeable by consumers for the same purposes, because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) (internal quotation marks omitted). The plaintiff must define both "a product market and a geographic market." *Concord Assocs., L.P. v. Entm't Props. Trust*, 817 F.3d 46, 52 (2d Cir. 2016). In addition, the plaintiff "must offer a theoretically rational explanation for why the boundaries of the market are defined as they are and must define the market according to the rules of interchangeability and cross-elasticity." *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 575 (S.D.N.Y. 2011) (internal quotation marks omitted); *see also AD/SAT, Div. of Skylight, Inc.*, 181 F.3d at 227 (defining cross-elasticity of

demand as an economic measure indicating whether "consumers would respond to a slight increase in the price of one product by switching to another product").

Here, Apotex fails to plausibly allege the relevant market. For its monopolization claim, Apotex alleges that the relevant product market is "that for the drug cefepime, including branded and AB rated generic products." SAC ¶ 170. For its attempted monopolization claim, Apotex alleges the same type of market for each of the other drugs subject to the parties' agreement. *Id.* ¶ 184. In all cases, the alleged geographic market is the United States. *Id.* ¶¶ 172, 184. Significantly, however, Apotex fails to "offer any plausible explanation as to why [the] market should be limited" to each individual drug and its AB-rated generic equivalents. *See Xerox Corp. v. Media Sciences Int'l, Inc.*, 511 F. Supp. 2d 372, 384 (S.D.N.Y. 2007). Apotex does not allege facts that plausibly rule out potentially interchangeable drugs, especially those within the same "therapeutic classes." SAC ¶ 38. Instead, it simply alleges in conclusory fashion that "[t]here are no products which are interchangeable or substitutable" and that "there is low elasticity of demand." SAC ¶¶ 174, 185. "[M]erely asserting that a commodity is in some way unique," however, "is insufficient to plead a relevant market. Rather, an antitrust complaint must explain why the market it alleges is the relevant, economically significant product market." *Concord Assocs., L.P.*, 817 F.3d at 54 (quoting *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 171 (S.D.N.Y. 1995)). Apotex's failure to do so, by itself, justifies dismissal. *See Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 143 (E.D.N.Y. 2010).

In addition, even assuming the relevant markets are as Apotex defines them, Apotex fails to allege that Hospira acquired market power. Critically, Apotex itself repeatedly alleges that Hospira could not set prices at a supra-competitive level. *See, e.g.*, SAC ¶¶ 100-01. In fact, one of Apotex's main allegations is that Hospira's scheme depended on using Apotex's confidential

pricing data to sell drugs "at prices on par with or near Apotex's contract pricing." SAC ¶¶ 101, 176(d). On top of that, Apotex alleges that there were "many" competing manufacturers producing "virtually identical drugs," including Qilu Pharmaceuticals Co., which Apotex itself ended up selecting as a replacement supplier for some of the relevant drugs. SAC ¶¶ 38-39, 148. Indeed, Apotex goes so far as to admit that the "generic antibiotic and antibacterial injectable Products, including cephalosporins," at issue in this case "belong to therapeutic classes in which generic competition is robust." SAC ¶ 38. Taken together, these allegations establish that Hospira did not, and could not, raise prices above the competitive level for any significant period of time as required to sustain an antitrust claim.

In arguing otherwise, Apotex points to Hospira's alleged market share. Apotex alleges that, as of August 2016, Hospira "had a 56.58 percent share of the cefepime market." SAC ¶ 173; *see also id.* ¶ 190 (alleging that there is a "dangerous probability" of monopolization because Hospira has "already reached monopoly-level shares of that market"). Market share can be a significant factor in the assessment of market power, at least when the alleged market share approaches ninety percent. *See Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*, 920 F. Supp. 455, 463-64 (S.D.N.Y. 1996) (discussing *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 424 (2d Cir. 1945) (L. Hand, J.) and citing *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 481 (1992)). But market share is not dispositive and it cuts the other way when, as here, the alleged percentage falls far short of ninety percent and other factors strongly indicate the absence of market power. *See PepsiCo*, 315 F.3d at 109 ("Absent additional evidence, such as an ability to control prices or exclude competition, a 64 percent market share is insufficient to infer monopoly power."); *Natsource LLC v. GFI Grp., Inc.*, 332 F. Supp. 2d 626, 635 (S.D.N.Y. 2004) ("Even market shares of approximately 50% are insufficient to demonstrate

market power where other factors such as low barriers to entry and strong competition . . . exist.").

Here, the most that Apotex alleges is that Hospira controlled 56.68% of the cefepime market for the month of August 2016. *See* SAC ¶ 94 (alleging, contrary to Paragraph 173, 56.68% instead of 56.58%). Elsewhere, Apotex alleges that Hospira had much smaller shares of the cefepime market: 6.79% in March 2013, 16.46% in August 2013, 18.26% in April 2014, and something in excess of 20% in May 2014. *Id.* ¶ 94. Moreover, Apotex alleges that Hospira's market share "fluctuated, often in lock-step with declines in Apotex's own market share." *Id.* Taken together, these allegations make clear that Apotex never reached a sufficiently large or durable market share to create an inference of monopoly power. They also confirm that Hospira lacked the ability to charge supra-competitive prices "for a significant period without erosion by new entry or expansion," *Commercial Data Servers*, 262 F. Supp. 2d at 73 (internal quotation marks omitted); *see also, e.g.*, *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 622 (S.D.N.Y. 2013) (dismissing a monopolization claim on a motion to dismiss where the "plaintiffs' only allegation suggesting that [the defendant] possesses monopoly power is that its market share is 60%").

Whether Apotex plausibly alleges a dangerous probability of Hospira acquiring market power with respect to ceftriaxone, cefazolin, cefoxitin, and pip/taz is a closer question (or, at least, would be if a relevant market were properly alleged), if only because "a lesser degree of market power may establish an attempted monopolization claim than that necessary to establish a completed monopolization claim." *Top Mkts., Inc.*, 142 F.3d at 100; *see H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1018 (2d Cir. 1989). Apotex alleges a 43.75% market share for ceftriaxone "as of January 2017," a 30.76% market share for cefazolin

"as of January 2016," and nothing with respect to cefoxitin and pip/taz.  SAC ¶ 191.  But for similar reasons, here too the Second Amended Complaint falls short.  That is, an attempted monopolization claim still requires "some degree of market power," *Top Mkts., Inc.*, 142 F.3d at 100, and "[a] company has monopoly power if it can sell a product or service for a supra-competitive price untroubled by market forces; in other words, if it is able to exert power to insulate its prices from competition," *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 562 F. Supp. 2d 392, 399 (E.D.N.Y. 2008).  Taken together, Apotex's own allegations make plain that there was never a "dangerous probability" that Hospira could insulate its prices from competition, given that Hospira was bound to the prices set by Apotex in competition with other major firms.  *See Bayer Schering Pharma AG*, 813 F. Supp. 2d at 580.

## CONCLUSION

In short, Apotex's own allegations make clear that it cannot state a plausible claim for monopolization or attempted monopolization.  In the final analysis, Apotex is essentially trying to recast a claim for breach of contract — a contract that restricts competition, no less — as an antitrust claim, which it may not do.  *See, e.g.*, *In re Adderall*, 754 F.3d at 135 ("The mere existence of a contractual duty to supply goods does not by itself give rise to an antitrust 'duty to deal.'"); *RxUSA Wholesale Inc. v. Alcon Labs.*, 391 F. App'x 59, 61 (2d Cir. 2010) (summary order) ("A refusal to deal with competitors does not constitute anticompetitive conduct in violation of Section 2 except in limited circumstances not present here.").  Accordingly, Apotex's antitrust claims must be and are dismissed.

That leaves two interrelated issues: amendment and jurisdiction.  Apotex requests, in the event that its antitrust claims are dismissed, "a conference to address next steps, including amendment."  Pl.'s Opp. 25.  Construing this as a cursory request for leave to amend, the Court

concludes that leave to amend would be futile. *See, e.g.*, *Rincon v. Covidien*, No. 16-CV-10033 (JMF), 2017 WL 2242969, at *2 (S.D.N.Y. May 22, 2017) ("Although courts 'should freely give leave when justice so requires,' a court need not grant leave to amend when further amendment would be futile." (quoting Fed. R. Civ. P. 15(a)(2)); *see also Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (per curiam) ("Where it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend."). The defects in Apotex's antitrust claims are "substantive" and arise from Apotex's own allegations, not from inadequate or inartful pleading. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). Moreover, Apotex has not pointed to additional facts it could allege that would cure these defects, and it did not do so previously when Hospira challenged its proposed amended allegations. *See* ECF Nos. 60-61. Accordingly, leave to amend the antitrust claims is denied.

Without the prospect of antitrust claims, however, it is not clear that this case should remain in federal court. Dismissal of the antitrust claims leaves only state-law claims and Apotex, a Delaware corporation, destroyed diversity by adding Hospira, Inc., another Delaware corporation, as a Defendant in the Second Amended Complaint. *Compare* SAC, *with* ECF No. 1, *and* ECF No. 34. Under 28 U.S.C. § 1367, the Court has discretion to exercise supplemental jurisdiction over the remaining state-law claims, and must balance the "traditional 'values of judicial economy, convenience, fairness, and comity'" to determine whether to do so. *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). The balance ordinarily does not support exercising jurisdiction "if all federal claims have been dismissed at the pleading stage." *Haynes v. Zaporowski*, 521 F. App'x 24, 28 (2d Cir. 2013) (summary order) (internal quotation marks omitted). Indeed, the Second Circuit recently reiterated that, "in the usual case in which all

federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (internal quotation marks omitted); *see, e.g.*, *Francis v. Hartford Bd. of Educ.*, 760 F. App'x 34, 38 (2d Cir. 2019) (summary order).

Unfortunately, the parties have not adequately briefed the question of subject-matter jurisdiction in the absence of the antitrust claims. In its memorandum of law in support of its motion, Hospira indicated, with little elaboration, that "the Court properly may elect to retain jurisdiction . . . or decline to do so." Defs.' Mem. 24. Apotex did not address the issue at all in its opposition brief, and Hospira provided no further discussion in its reply brief. Accordingly, the Court will reserve judgment on whether it should exercise supplemental jurisdiction over the remaining state-law claims (and, by extension, reach Hospira's argument with respect to the punitive damages claim) or dismiss the case without prejudice to refiling the state-law claims in state court pending further briefing. No later than **January 17, 2020**, each side shall submit a supplemental brief, not to exceed five pages, addressing the issue.

The Clerk of Court is directed to terminate ECF No. 84.

SO ORDERED.

Dated: January 6, 2020
     New York, New York

JESSE M. FURMAN
United States District Judge